IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

DAVID FERNANDEZ, JIM AKASALA,                    :
AND JOSEPH SCUTTS, Individually and on     :          Case No. 12-CV-7193 (PKC)
Behalf of All Others Similarly Situated,              :
                                                       :
                    Plaintiffs,                        :
                                                       :
          -against-                                    :
                                                       :
WELLS FARGO BANK, N.A., WELLS          :
FARGO & COMPANY, AND WFC               :
HOLDINGS CORPORATION,                      :
                                                       :
                    Defendants.                        :
                                                       :
------------------------------------------------------- X


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

JOSEPH SCUTTS, DAVID FERNANDEZ,        :
AND JIM AKASALA, Individually and on      :          Case No. 12-CV-7194 (PKC)
Behalf of All Others Similarly Situated,              :
                                                       :
                    Plaintiffs,                        :
                                                       :
          -against-                                    :
                                                       :
WACHOVIA CORP., WACHOVIA BANK,      :
N.A., WELLS FARGO BANK, N.A.,               :
WELLS FARGO & COMPANY, AND WFC    :
HOLDINGS CORPORATION,                      :
                                                       :
                    Defendants.                        :
                                                       :
------------------------------------------------------- X


**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS
CERTIFICATION AND FLSA CONDITIONAL CERTIFICATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND .................................................................................8

    A.    Wells Fargo Employs Thousands Of Personal Bankers In More Than 750 Banks In The Northeast Region During The Proposed Class Period. ...................8

    B.    Wells Fargo Policy Requires Personal Bankers To Record All Time Worked And Prohibits Off-The-Clock Work. ........................................................9

ARGUMENT AND AUTHORITIES .......................................................................10

PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED ..........................................................................................................10

    A.    After Extensive Discovery In *Richardson* And *Switzer*, Plaintiffs Must Meet A More Demanding Standard For FLSA Conditional Certification. ...................10

    B.    Plaintiffs' Evidence Falls Far Short Of The Evidence Presented In *Winfield* and *Abercrombie*. ...........................................................................................11

    C.    Plaintiffs' Evidence Does Not Support A Regional Or State-Wide Class Or Collective Action. ............................................................................................17

        1.    Plaintiffs' Reliance On Job Descriptions/Postings Is Misplaced And Does Not Establish An Unlawful Policy Concerning Marketing Activities. .......................................................................17

        2.    Plaintiffs Unfairly Cite Out-Of-Context Testimony From Wells Fargo's Payroll Manager .....................................................................19

        3.    Plaintiffs' Timekeeping Records And Their Mischaracterization Of Testimony Do Not Establish An Unlawful Policy Concerning Opening And Closing Procedures. ............................................................20

        4.    Plaintiffs' Claims Regarding Automatic Deductions For Lunch Breaks Are Demonstrably False And Were Rejected By Judge Atlas In *Richardson*. ....................................................................24

    D.    The Attached Declarations From Other Personal Bankers Refute Plaintiffs' Claims. ........................................................................................................26

    E.    As Judge Atlas Recognized, Plaintiffs' Off-The-Clock Allegations Will Require Numerous, Highly Individualized Inquiries ..........................................28

F.      Plaintiffs Represent A Miniscule Percentage Of The Proposed Class. ................31

G.      Each Putative Class Member Is Subject To Different Defenses...........................34

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED .................34

A.      Class Certification Standard Under Rule 23 ...........................................................34

B.      The Various Documents And One Work-Hours Survey Prepared Before
        The FS Reclassification Do Not Support Plaintiffs' Off-The-Clock Claims. .......35

        1.      The "Work Hours Survey" Does Not Support Plaintiffs' Claims. ...........36

        2.      The Transition To Overtime For FSs Was Gradual; Wachovia
                Eliminated And Reduced "Time Robbers."................................................37

        3.      The Role Play Exercises And FS Focus Surveys Do Not Support
                Plaintiffs' Off-The-Clock Claims. ............................................................39

        4.      There Is No Direct Correlation Between Performance And Hours
                Worked........................................................................................................40

C.      Wachovia's Use Of The FWW Overtime Method Was Legally Sound And
        Not An Unlawful Common Policy. .......................................................................42

        1.      The Putative Class Members' Hours Fluctuated From Week To
                Week. ..........................................................................................................42

        2.      The Putative Class Members Had A Clear Understanding
                Regarding The FWW Method. ...................................................................45

D.      Plaintiffs Cannot Re-litigate The Legality Of The Bonus Payments Because
        Judge Atlas Previously Decided This Exact Legal Question Against Them.........47

E.      Plaintiffs' Off-The-Clock Claims Fail To Meet The Rigorous Rule 23
        Standard ................................................................................................................48

        1.      Plaintiffs Cannot Establish Commonality And Typicality Under
                Rule 23(a)...................................................................................................48

        2.      Plaintiffs Cannot Satisfy The Predominance Requirement .......................49

F.      Plaintiffs' ERISA Claims Are Not Suitable For Class Certification Under
        Rule 23 ..................................................................................................................51

        1.      The Named Plaintiffs Are Not Adequate Representatives Because
                They Failed To Exhaust Their Plan Remedies ..........................................51

2.      Plaintiffs' ERISA Claims Should Not Be Certified For The Same
        Reasons Why Their Overtime Claims Should Not Be Certified. ..............52

CONCLUSION............................................................................................................................53

15365981v.1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adair v. Wis. Bell, Inc.*,
No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ................................................13

*Amador v. Superintendents of the Dep't of Corr. Servs.*,
No. 03 Civ. 0650 (KTD) (GWG), 2005 U.S. Dist. LEXIS 20249 (S.D.N.Y 2005)................52

*Aponte v. Comprehensive Health Management*,
No. 10 Civ. 4825 (PKC), 2011 U.S. Dist. LEXIS 60882 (S.D.N.Y. June 2, 2011) ................49

*Badgett v. Tex. Taco Cabana, L.P.*,
No. H-05-3624, 2006 U.S. Dist. LEXIS 74530 (S.D. Tex. Oct. 12, 2006).............................34

*Basco v. Wal-Mart Stores, Inc.*,
216 F. Supp. 2d 592 (E.D. La. 2002) ....................................................................................50

*Blaney v. Mecklenburg Hosp. Auth.*,
No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302 (W.D.N.C. Sept. 16, 2011).......................31

*Brothers v. Portage Nat'l Bank*,
No. 3:06-94, 2009 U.S. Dist. LEXIS 109769 (W.D. Pa. Mar. 24, 2009)................................28

*Condo v. Sysco Corp.*,
1 F.3d 599 (7th Cir. 1993), cert. denied, 510 U.S. 1110 (1994)..............................................45

*Corley v. Jahr*,
No. 11 Civ. 9044 (RJS)(KNF), 2013 U.S. Dist. LEXIS 10012 (S.D.N.Y. Jan. 23,
2013) .........................................................................................................................................47

*Cruz v. Dollar Tree Stores, Inc.*,
Nos. 07-2050 SC and 07-4012 SC, 2011 U.S. Dist. LEXIS 73938 (N.D. Cal. July 8,
2011) .........................................................................................................................................32

*Daniels v. Michiana Metronet, Inc.*,
No. 1:09-cv-121, 2010 U.S. Dist. LEXIS 43686 ....................................................................45

*Davis v. Abercrombie & Fitch Co.*,
No. 08 Civ. 1859 (PKC), 2008 U.S. Dist. LEXIS 86577 (S.D.N.Y. Oct. 22, 2008)......3, 11, 12

*Diaz v. Elecs. Boutique of Am., Inc.*,
No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005)................31

*Dingwall v. Friedman Fisher Assocs.*,
3 F. Supp. 2d 215 (N.D.N.Y. 1998).......................................................................................46

iv

*Eastman Kodak Co. v. STWB, Inc.*,
   452 F.3d 215 (2d Cir. 2006) ........................................................................................51

*Eng-Hatcher v. Sprint Nextel Corp.*,
   No. 07 Civ. 7350(BSJ), 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ............................16, 17

*England v. Advance Stores Co.*,
   263 F.R.D. 423 (W.D. Ky. 2009) .............................................................................50, 12

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990) ........................................................................................51

*Gen. Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (U.S. 1982) ............................................................................................48

*Guillen v. Marshalls of MA. Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2012) ......................................................................32, 33

*Hardemon v. H&R Block Eastern Enters.*,
   No. 11-20193-CIV-MOORE/TORRES, 2011 U.S. Dist. LEXIS 93991 (S.D. Fla. Aug.
   13, 2011) ................................................................................................................11

*Hoffmann v. Sbarro, Inc.*,
   982 F. Supp. 249 (S.D.N.Y. 1997) ..............................................................................10

*Iglesias-Mendoza v. La Belle Farm Inc.*,
   239 F.R.D. 363 (S.D.N.Y. 2007) ................................................................................48

*In re Bally Total Fitness of Greater New York, Inc.*,
   411 B.R. 142 (S.D.N.Y. 2009) ....................................................................................50

*In re Fosamax Prods. Liab. Litig.*,
   248 F.R.D. 389 (S.D.N.Y. 2008) ................................................................................49

*In re Hyman*,
   502 F.3d 61 (2d Cir. 2007) ........................................................................................47

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ........................................................................................35

*Jenkins v. TJX Cos.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) ..........................................................................10

*M.O.C.H.A. Soc., Inc. v. City of Buffalo*,
   No. 98 Civ. 99, 2008 WL 343011 (W.D.N.Y. Feb. 6, 2008) ..............................................35

*MacGregor v. Farmers Ins. Exchange*,
   No. 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361 (D.S.C. July 22, 2011) ............................7

v

*Mooney v. Aramco Servs. Co.*,
  54 F.3d 1207 (5th Cir. 1995) ........................................................................................34

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) .......................................................................................49

*Morales v. Plantworks, Inc.*,
  No. 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006)......................17

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) .........................................................................................10

*Oplchenski v. Parfum Givenchy, Inc.*,
  254 F.R.D. 489 (N.D. Ill. 2008) ...................................................................................52

*Pfohl v. Farmers Ins. Group*,
  No. cv 03-3080, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004) ...............................33

*Rodgers v. CVS Pharmacy, Inc.*,
  No. 8:05cv770T-27MSS, 2006 U.S. Dist. LEXIS 23272 (M.D. Fla. Mar. 22, 2006) ...........34

*Romero v. H.B. Auto. Group, Inc.*,
  No. 11-CV-386 (CM), 2012 U.S. Dist. LEXIS 61151 (S.D.N.Y. May 1, 2012) ...................10

*Scott v. New York City Dist. Council of Carpenters Pension Plan*,
  224 F.R.D. 353 (S.D.N.Y. 2004) ...................................................................................51

*Seever v. Carrols Corp.*,
  528 F. Supp. 2d 159 (W.D.N.Y) .....................................................................................32

*Simmons v. T-Mobile USA, Inc.*,
  No. H-06-1820, 2007 U.S. Dist. LEXIS 5002 (S.D. Tex. Jan. 24, 2007) ...............................33

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) .........................................................................................47

*Valerio v. Putnam Assocs., Inc.*,
  173 F.3d 35 (1st Cir. 1999) ...........................................................................................45

*Vazquez v. Vitamin Shoppe Indus.*,
  No. 10 Civ. 8820 (LTS)(THK), 2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11,
  2011) ..........................................................................................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ................................................................................31, 35, 48

*White v. KCPAR, Inc.*,
  No. 6:05-CV-1317, 2006 U.S. Dist. LEXIS 100966 (M.D. Fla. June 2, 2006)................33, 34

vi

*White v. Osmose, Inc.,*
   204 F. Supp. 2d 1309 (M.D. Ala. 2002) ..............................................................10, 18

*Williams v. Accredited Home Lenders, Inc.,*
   No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25, 2006).........18, 28

*Winfield v. Citibank, N.A.,*
   843 F. Supp. 2d 397 (S.D.N.Y. 2012) .......................................2, 4, 5, 6, 11, 12, 13, 14, 15, 16

STATUTES

29 U.S.C. § 1133 ...........................................................................................................51

FLSA § 216(b) ........................................................................................1, 17, 18, 48

Portal-to-Portal Act, 29 U.S.C. § 254 ...................................................................34

OTHER AUTHORITIES

29 C.F.R. § 778.114(a) ...............................................................................................35

29 C.F.R. § 2560.503-1 *et seq.*...............................................................................51

FED. R. CIV. P. 23 .............................................................................................. *passim*

15365981v.1

Defendants (collectively, "Wells Fargo") submit this opposition to Plaintiffs' motion for conditional certification and Rule 23 class certification (the "Motion" or "Plaintiffs' Motion").

## PRELIMINARY STATEMENT

The three named plaintiffs in these cases, represented by the same counsel, previously asserted materially identical "off-the-clock" overtime claims in two federal lawsuits filed in Houston, Texas.[1] In *Richardson* and its related case, after Plaintiffs conducted discovery for 10 months, taking six company-representative depositions and reviewing over 10,000 pages of documents, Judge Atlas denied their motion for nationwide conditional certification under FLSA § 216(b). In her opinion denying Plaintiffs' motion, Judge Atlas held that:

- "Plaintiffs have not produced evidence that Defendant has had in the past or now has a national, company-wide decision, policy, or plan to deny personal bankers overtime pay;"[2]
- "Plaintiffs' own depositions reveal that some managers had no knowledge and others had little knowledge about subordinates' alleged off-the-clock work activities;"[3] and that
- "[R]esolution of each Plaintiff's claims will require individualized inquiries about his or her specific managers' policies and practices."[4]

Despite this ruling, Plaintiffs claim that even though they were unable to produce any evidence of a national plan or policy in *Richardson*,[5] they can nevertheless now show that Wells Fargo had a "region-wide and/or statewide" policy of denying PBs overtime pay. But Judge Atlas also disposed of this issue in *Richardson*; she found that there was no such policy

---

[1] *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-cv-00738 (S.D. Tex. 2011) (original complaint attached hereto as Ex. R-1); *Switzer v. Wachovia Corp.*, No. 4:11-cv-01604 (S.D. Tex. 2011) (original complaint attached hereto as Ex. R-2). The plaintiffs in *Richardson* were former and current Wells Fargo Personal Bankers ("PB"s). In *Switzer*, the plaintiffs were former Wachovia Financial Specialists ("FS"s). Just like the *Fernandez* and *Scutts* cases here, *Richardson* and *Switzer* were heard by one judge, The Honorable Judge Nancy Atlas.

[2] *See* Memorandum and Order, *Richardson v. Wells Fargo Bank, N.A.*, Case No. 4:11-cv-00738, Docket No. 53 (S.D. Tex. Feb. 2, 2012) (hereinafter, "*Richardson* Order"), Ex. R-3, at 11.

[3] *Id.* at 15.

[4] *Id.*

[5] *Id.* at 9.

applicable to any region or any other smaller group of bank branches.  As she wrote, "Indeed, there has been insufficient proof or even argument of a single decision, policy, or plan, covering a smaller number of [Wells Fargo's] bank branches to warrant collective treatment."[6]

Nothing has changed since Judge Atlas wrote her decision last year.  Plaintiffs have conducted little to no additional discovery regarding their off-the-clock claims and they have not provided testimony from any additional witnesses.  Rather, they have simply revised their own declarations that they previously submitted in *Richardson/Switzer* and have attempted to put a new face on the same arguments asserted there.  Specifically, Plaintiffs have attempted to re-tool their testimony and arguments to conform with the recent decision in *Winfield v. Citibank, N.A.,* 843 F. Supp. 2d 397 (S.D.N.Y. 2012)—in fact, copying key portions of the case almost verbatim. For example, Plaintiffs claim:

> Wells Fargo … employed a 'dual-edged' policy of strictly limiting the number of overtime hours that [Personal Bankers ("PBs")] could accrue while imposing onerous production goals and job duties that could not reasonably be accomplished within a 40 hour workweek.[7]

Again, however, Plaintiffs made this very same allegation in *Richardson*, and according to Judge Atlas, they offered nothing of substance to support such a claim.  As she held:

> To prove a company-wide national policy, Plaintiffs also rely on personal bankers' alleged difficulty of finishing all their assigned duties within a forty hour

---

[6] *Id.* at note 49.  In the *Switzer* case, Judge Atlas denied conditional certification on different grounds.  But during a hearing shortly after issuing the *Richardson* Order, Judge Atlas explained she saw two distinct issues in *Switzer*: (1) a fluctuating workweek issue; and (2) an off-the-clock, *Richardson*-style issue.  Plaintiffs' counsel conceded *Switzer*'s similarity to *Richardson*, stating, "Your Honor, we are not pursuing the *Richardson* case.  We are only pursuing the first part of that, which is the fluctuating workweek piece."  *See* Ex. R-4 at 7:1-24, Transcript of Status Conference Before The Honorable Nancy F. Atlas, *Switzer et al. v. Wachovia Corp. et al.*, Case No. 4:11-cv-01604 (S.D. Tex. Feb. 23, 2012).

[7] Plaintiffs' Motion at 7; *cf. Winfield*, 843 F. Supp. 2d at 400 ("[D]efendant employed a 'dual-edged' policy of strictly limiting the amount of overtime that Personal Bankers could accrue while imposing rigorous sales quotas that could not feasibly be met in a forty-hour work week.").

workweek[] and managers' alleged awareness that employees worked unlogged hours.[8]

…

Of key significance, most Plaintiffs provide no evidence that their supervisors actually told them that they must perform work off-the-clock, nor do most Plaintiffs provide proof of any rejected request for overtime pay for the tasks at issue.  Plaintiffs' declarations and depositions establish that most Plaintiffs *believed* that they had to work off-the-clock in certain respects. ….  Subjective beliefs or fears about logging overtime is insufficient to establish an actual company-wide policy.[9]

Undeterred, Plaintiffs have now "corrected" their testimony and submitted a revised set of declarations.  Yet this revised testimony should be disregarded because it plainly contradicts Plaintiffs' prior declarations and/or deposition testimony.  Once again, Judge Atlas reached the same conclusion in *Richardson* based on Plaintiffs' contradictory and inconsistent testimony in that case—even before Plaintiffs' latest revised declarations:

At the notice stage, the Court does not evaluate the credibility of the Plaintiff's evidence. The Court, however, has not considered any statements in declarations that are plainly contradicted by the witness's prior deposition testimony. For example, … Fernandez did not mention doing any unpaid lunch-time marketing [in his deposition] …  Scutts did not mention that he was not paid for closing the bank even though he was asked about the scope of activities for which he was not paid … To the extent that these Plaintiffs stated they could not recall or did not mention particular off-the-clock activities when so asked during depositions, the Court rejects Plaintiffs' statements in their declarations asserting lack of payment for those activities.[10]

Judge Atlas reached this conclusion despite the well-known principle recognized by both this Court and Judge Atlas that "[a]t this phase, the court does not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations." *Davis v. Abercrombie & Fitch Co.*, No. 08 Civ. 1859 (PKC), 2008 U.S. Dist. LEXIS 86577, *9 (S.D.N.Y. Oct. 22,

---

[8] *Richardson* Order, Ex. R-3, at 16-17.

[9] *Id*. at 14, 16-17 (emphasis in original).

[10] *Id*. at note 22.

3

2008).[11]  As quoted above, Judge Atlas acknowledged this principle but went on to observe that, even without making credibility determinations, she would ignore contradictory testimony from the same witness—*i.e.*, she would not credit either version of a witness's contradictory testimony; rather, she decided to disregard both versions.  Likewise, the Court here should do the same with Plaintiffs' evolving and contradictory testimony.  Specifically, set forth below in the left-hand boxes are examples of Plaintiffs' latest, revised testimony offered to support their *Winfield* theories.  None of these allegations was asserted in Plaintiffs' prior declarations or their prior depositions.   The right-hand column below shows Plaintiffs' prior sworn deposition testimony that directly contradicts their new, post-*Winfield* testimony (including Plaintiff Akasala who was deposed only two days before he submitted a declaration in this case):

| NEW TESTIMONY | •PRIOR TESTIMONY |
|---|---|
| **Complaints**. Plaintiff Akasala testified for the first time that he told his managers he was performing marketing activities off the clock. (Akasala Decl. ¶ 21). | •In his deposition, Akasala testified: "Q. Did you ever have any conversations while you were with Wachovia or Wells Fargo about the company not paying you overtime like you thought it should? A. No." (Akasala Dep. at 28:2-28:6). |
| **Regional Conference Calls.** Plaintiffs testify for the first time they were told in regional and district conference calls not to record overtime and it would not be approved. (Akasala Decl. ¶ 18, Fernandez Decl. ¶ 17, Scutts Decl. ¶ 16). | •Fernandez and Scutts never mentioned such calls in their depositions—despite being asked to relate every conversation they had regarding overtime.<br>•Akasala only identified calls with a District Manger—not a Regional Manager—and the call only had a limited number of people on it.  (Akasala Dep. at 23:14-25:24). |
| **Recording Only Scheduled Hours.** Plaintiff Akasala testifies for the first time that he would only to record, and he would only be paid for, his scheduled hours. (Akasala Decl. ¶ 32). | •In his deposition, Akasala testified: "Q. Was it your understanding that if you were scheduled to do something that you would be paid for your time if it was on the schedule? A. Not sure. Q. You don't know one way or the other on that?  A. I am not sure.  Q. So the schedule and your time that you entered didn't really have any connection in your mind?  A. Not really." (Akasala Dep. at 84:5-84:15). |

---

[11] *Id.* at note 22 ("At the notice stage, the Court does not evaluate the credibility of the Plaintiff's evidence.").

| NEW TESTIMONY | PRIOR TESTIMONY |
|---|---|
| **No Overtime In Excess Of Labor Budgets**. Plaintiffs testify for the first time that they were told overtime would not be approved if it was not in a budget. (Akasala Decl. ¶ 18, Fernandez Decl. ¶ 20, Scutts Decl. ¶ 19). | • Plaintiffs did not testify about labor budgets in their depositions, even though they were asked, for example in Akasala's deposition, Akasala was asked to provide "the full context" of what was said, to relate "everything that [was] said when he was discussing overtime," and to relate every conversation he could recall "relating to overtime in any way." (Akasala Dep. at 19:16-19:18; 38:21-38:25). |
| **Co-Workers**. Plaintiffs also testify for the first time that FSs/PBs complained on conference calls that they could not meet their sales goals in a 40-hour workweek. (Akasala Decl. ¶¶ 14-15, Fernandez Decl. ¶ 17, Scutts Decl. ¶ 16). | • Fernandez was not aware of any co-workers complaining about off-the-clock work. (Fernandez 70:5-70:9, 105:16-105:23).<br>• According to Scutts: "I recall being on the call. I don't recall hearing what other people said." (Scutts Dep. at 139:10-139:11).<br>• Akasala could not recall any co-workers complaining on these conference calls. (Akasala Dep. at 28:7-28:10). |
| **Co-Workers**. Plaintiff Akasala testifies for the first time that he was aware of numerous FSs/PBs who worked off the clock. (Akasala Decl. ¶ 17). | • Akasala only recalls the first names of two FSs who allegedly worked off the clock. (Akasala Dep. at 29:10-39:4).<br>• Fernandez was not aware of any co-workers working off the clock. (Fernandez Dep. at 105:16-105:23).<br>• Scutts does not recall any co-workers complaining about working off the clock. (Scutts Dep. at 137:15-139:19). |
| **Time Shaving**. Plaintiff Akasala testifies for the first time that his time records were revised to reduce or eliminate overtime. (Akasala Decl. ¶ 20). | • Akasala did not allege in his deposition that he had time records revised to reduce or eliminate overtime.<br>• No other Plaintiffs make this allegation. |
| **Emails.** Plaintiffs also testify for the first time that they were told in emails not to record overtime. (Akasala Decl. ¶ 22, Fernandez Decl. ¶ 18, Scutts Decl. ¶ 17). | • When asked about these emails in his deposition, Akasala said the emails said overtime would not be approved, not that FSs could not record overtime already worked. (Akasala Dep. at 39:5-39:9).<br>• The other Plaintiffs did not mention these emails in their depositions. |

In *Winfield*, the court conditionally certified the proposed class of employees based on significant evidence showing that they were working off the clock and that the bank's managers were aware of this activity, including significant evidence that managers were shaving overtime hours from employee timecards and telling employees not to log overtime hours they had <u>already</u> worked.  As the court wrote, "Unlike in the cases cited by the defendants, the plaintiffs here

5

provide testimony from Personal Bankers employed in different branch locations across the nation"—specifically, "in thirteen different branches in six of the thirteen states where the defendant operates." *Winfield*, 843 F. Supp. 2d at 407. The plaintiffs' testimony was un-contradicted and specific. They provided detailed evidence supporting their claims, including the identities of the managers who told them not to record overtime; mangers who "refus[ed] to approve timesheets indicating overtime hours worked; [and managers who] shav[ed] hours off timesheets they submitted." *Id*. at 405.

Further, the plaintiffs submitted company emails demonstrating unequivocally that management was aware of the off-the-clock work, including one email from a **manager** in which she described the problem precisely, stating as follows:

> The [Personal Bankers] have been working way more than 40 hours and not getting paid for it .... It seems that they were pressured to work overtime in order to meet goals but were told that overtime is not acceptable and will not be accepted and therefore [was] not allowed to be entered into the system.

*Id.* at 406.

The plaintiffs in *Winfield* also testified consistently (and corroborated each other's testimony) that branch managers instructed them or pressured them not to record overtime hours that they had already worked or affirmatively altered their timesheets to remove overtime hours recorded. *Id.* at 401, 405. And they claimed that branch managers in several branches across the country refused to approve timesheets reflecting overtime hours *already worked*. *Id.* at 406, 407-08.

In contrast, the four Plaintiffs here—all of whom worked at a total of six branches in a one-half square mile area of Manhattan—provide no such evidence. And the testimony they do present is inconsistent and contradicted by their prior sworn statements in *Richardson/Switzer*. Moreover, Wells Fargo has provided uncontroverted evidence refuting Plaintiffs' allegations.

6

First, company time records show that Plaintiffs were in fact paid significant overtime. Second, the 46 declarations from former Wachovia FSs in New York and current Wells Fargo PBs throughout the Northeast Region (including declarations from FSs/PBs who worked at the <u>same</u> locations and/or districts and under the <u>same</u> supervisors and/or district managers as Plaintiffs) show that they were paid for their overtime; they were not instructed not to record their overtime; and they were not pressured to work off the clock. Most importantly, however, many of these declarations also refute Plaintiffs' central premise in this case—that they could not complete their job duties and meet their sales quotas in a 40 hour workweek.

Regardless, at a minimum, the evidence in its totality shows that, as Judge Atlas held, the "resolution of each Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices."[12] As one court wrote in a similar case regarding alleged off-the-clock work during lunch breaks:

> An analysis of lunch breaks will require the court, and eventually a jury, to determine whether each individual plaintiff actually took lunch breaks, their frequency and duration, whether each plaintiff's supervisor advised the employee how to report worked lunch breaks, whether the employee did in fact report worked lunch breaks, how many breaks were interrupted, if any, and how many of the missed or interrupted breaks were compensated.

*MacGregor v. Farmers Ins. Exchange*, No. 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361, *16 (D.S.C. July 22, 2011). The very same conclusion applies here, and it applies not only with respect to Plaintiffs' alleged lunch time claims, but also to Plaintiffs' claims regarding working before and after their shifts. For each instance of each category of alleged off-the-clock work for each plaintiff, a jury will have to determine whether it occurred; how frequently and for how long; whether the plaintiff reported the work and was compensated for it; and whether the

---

[12] *See Richardson* Order, Ex. R-3, at 15.

particular supervisor was aware of the off-the-clock work.  Accordingly, as shown more fully below, Plaintiffs' motion for certification should be denied.

## FACTUAL BACKGROUND

**A.    Wells Fargo Employs Thousands Of Personal Bankers In More Than 750 Banks In The Northeast Region During The Proposed Class Period.**

During the proposed class period, Wells Fargo employed and continues to employ thousands of PBs in more than 750 bank branches throughout the Northeast Region, including over 80 branches in New York State.[13]  Wells Fargo employs PBs in its banks to provide financial solutions, such as deposit, loan, mortgage, and investment services to its customers. They develop and maintain Wells Fargo's customer relationships by assisting walk-in customers at the bank branches, making telephone calls to prospective and existing customers to set up appointments, and some employees (but not all) visit local businesses (typically during their regularly-scheduled shifts) to market Wells Fargo products.[14]  PBs are supervised by a Branch Manager at each respective bank location.[15]  The Branch Managers typically (but not always) prepare in advance the work schedules for the PBs in each bank.[16]

Generally speaking, Wachovia FSs performed similar tasks to Wells Fargo PBs.  Unlike PBs, FSs were supervised by Financial Sales Leaders ("FSLs") who were not present at the bank branches, but instead managed and coached FSs from several banks in a district.[17]

---

[13]  *See* Wells Fargo's 2010 Annual Report, which is available at https://www.wellsfargo.com/_downloads/pdf /invest_relations/wf2010annualreport.pdf. From 2009 until approximately April 2012, Wells Fargo's Northeast Region included New York, New Jersey, and Connecticut.  Declaration of Mary Evans, Ex. M, at ¶ 36.  Since April 2012, the Northeast Region has included Connecticut, Delaware, New Jersey, New York, and Pennsylvania.  *Id.* Wells Fargo did not have a Northeast Region until 2009.  *Id.*

[14]  *See generally* Exs. O-8 and Q-8, Comparison Among Declarants Regarding Offsite Marketing.

[15]  Declaration of Christine Smith, Ex. C, at ¶ 5.

[16]  *Id*. at ¶ 6.

[17]  Deposition Of Constantine "Nino" Santiano ("Santiano Dep."), Ex. B-2, at 22:2-22:6, 47:5-47:10.  Wachovia operated banks in several states across the United States until it was purchased by Wells Fargo in approximately 2008. During the proposed class period ending in approximately 2009, Wachovia employed hundreds of FSs in

8

**B.    Wells Fargo Policy Requires Personal Bankers To Record All Time Worked And Prohibits Off-The-Clock Work.**

Wells Fargo policy requires that non-exempt employees: (1) accurately and correctly record all time worked; and (2) inform or contact Human Resources if their pay does not accurately reflect their hours worked.[18]   Although PBs are sometimes given work schedules several days or weeks ahead of time, they can work—and thus are required to report—time worked before and after their scheduled hours.[19]   Furthermore, Wells Fargo's employee handbook directs all non-exempt employees to take a lunch break and instructs them to log on their timecards any occasions when they perform work during their lunch break.[20]   Company policy also specifically prohibits managers from working employees off the clock.[21]   Wachovia had similar policies that prohibited FSs from working off the clock and required them to accurately record all their hours worked and contact the HR Service Center if anyone instructed them to incorrectly report their time.[22]   As outlined below, Wells Fargo has presented 46

---

[footnote] more than 80 bank branches throughout New York state. *See* Wells Fargo's 2008 Annual Report, available at https://www.wellsfargo.com/downloads/pdf /invest_relations/wf2008annualreport.pdf.

[18] *See, e.g.*, Excerpts from Wells Fargo's 2011 Team Member Handbook, Ex. C-2, at WF 000828 ("If you're in a nonexempt position, you're responsible for submitting timely and accurate records of the hours you work."); *see also* Deposition of Teresa Swanson ("Swanson Dep."), Ex. B-1, at 151:3-151:4 ("We require that all team members report to the minute their time.").

[19] *See generally* Exs. O-10 and Q-10, Comparison Among Declarants Regarding Timekeeping Policies And Procedures.  *See, e.g.*, Coppins Decl., Ex. P-6, ¶ 7 ("I am typically scheduled to work 40 hours per week.  The schedule is designed so that there is always a Personal Banker in the store during business hours. … Regardless of the schedule that I receive one month in advance, I have been told by my managers at Wells Fargo to log on my timecard the actual hours that I work even if the hours are outside of my regular schedule.") (New York City).

[20] *See, e.g.*, Excerpts from Wells Fargo's 2011 Team Member Handbook, Ex. C-2, at WF 000828 ("If you're a nonexempt team member, you must take the required meal period to which you're entitled during the workday … Meal periods are considered unpaid time.  If for any reason, on occasion, your supervisor requires you to work or stay at your workstation during your meal period, it's considered paid time and should be recorded as work time.").

[21] *See, e.g*, Excerpts from Wells Fargo 2011 FLSA Training Guide, Ex. C-3, at WF 001233 ("To comply with Wells Fargo's overtime policy, managers **will not**: … Deny overtime pay to a team member, even if the overtime was unauthorized [or] Require or allow team members to work extra hours off the clock.") (emphasis in the original).

[22] Excerpts from My Time Online Resource Guide, Ex. M-1, at WF 003469; *see also* Wachovia's Dispute Resolution Policy, Ex. M-2, WF 002291 - WF 002294, Coaching And Support For All Employees And Managers, Ex. M-3, WF 002614 - WF 002637, and Your Source For HR Advice And Consulting, Ex. M-4, WF 002638 - WF 002648.

15365981v.1

declarations from current and former FSs/PBs in New York and the Northeast Region showing that they understood or currently understand these policies and that they and their managers follow(ed) them on a daily basis.

## ARGUMENT AND AUTHORITIES

## PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED

### A.   After Extensive Discovery In *Richardson* And *Switzer*, Plaintiffs Must Meet A More Demanding Standard For FLSA Conditional Certification.

Conditional certification of a collective action is not a rubber stamp as Plaintiffs suggest. Rather, before subjecting an employer to the significant and costly burdens of a collective action, even at the preliminary notice stage—*i.e.*, even when no discovery has occurred—Plaintiffs must demonstrate that they and the class of putative plaintiffs they seek to represent "together were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (citing *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997). While some courts have described Plaintiffs' burden of proof as modest, "it is not non-existent -- certification is not automatic." *Romero v. H.B. Auto. Group, Inc.*, No. 11-CV-386 (CM), 2012 U.S. Dist. LEXIS 61151, at *27  (S.D.N.Y. May 1, 2012) (internal citations omitted).  To satisfy this standard, the Court must find "some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims" of a particular unlawful policy or practice. *Jenkins v. TJX Cos.,* 853 F. Supp. 2d 317, at *322 (E.D.N.Y. 2012) (internal citations omitted).

Plaintiffs here seek to invoke a lenient standard.  Yet they have already had substantial discovery in *Richardson* and *Switzer*, and as a result, should be held to a more "rigorous review." *See White v. Osmose, Inc.,* 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002) (finding it necessary to "carefully consider the submissions of the parties with respect to the class

10

allegations, rather than merely relying on the handful of affidavits" that supported the plaintiff's position); *see also Hardemon v. H&R Block Eastern Enters.*, No. 11-20193-CIV-MOORE/TORRES, 2011 U.S. Dist. LEXIS 93991, *2 (S.D. Fla. Aug. 13, 2011) (applying a more exacting level of scrutiny rather than the lenient one where substantial discovery has occurred).

**B.      Plaintiffs' Evidence Falls Far Short Of The Evidence Presented In *Winfield* and *Abercrombie*.**

As shown above, Plaintiffs cannot ignore their prior testimony and create revised, "corrected" declarations to mimic the allegations in *Winfield*.  Their inconsistent testimony does not support those allegations, and thus the rationale underlying *Winfield* does not apply here. Likewise, Plaintiffs' contradictory testimony does not approach the level of evidence submitted by the plaintiffs in *Abercrombie*.  In that case, the plaintiffs claimed that regional managers in New York and New Jersey directed them to "record at most forty hours on their timesheets, regardless of actual hours worked; and told [employees] to submit timesheets to *regional managers* instead of human resources so the records could be falsified if needed."  *Abercrombie*, 2008 U.S. Dist. LEXIS 86577 at *33 (emphasis added).  The plaintiffs stated that managers directed them to "adjust the punches" to make it appear as though they were working only forty hours per week *regardless of actual hours worked*.  *Id.*  And during regional conference calls, they were "specifically instructed *never* to record more than forty hours per week on … time sheets." *Id.* at *7-8 (emphasis added).

The evidence in this case is different for a number of reasons.  First, the Plaintiffs here acknowledged in their depositions that they worked and reported overtime on their timecards,

and that they were paid for that time.[23]   Their payroll records confirm this and show that

Plaintiffs were paid overtime—often on a consistent basis. [24] Second, unlike in *Winfield* and

*Abercrombie*, the Plaintiffs have not offered consistent testimony that their supervisors were

aware of their alleged off-the-clock work.  Instead, Plaintiffs' contradictory and inconsistent

statements here undermine the overall reliability of their testimony.  At deposition, Fernandez

was unable to identify a single manager who was aware that he had worked off the clock,[25] and

while Akasala alleged that his district manager stated he would not approve overtime, Akasala

admitted that he never complained about not having approval to work overtime.[26]  Third, in their

depositions and previous declarations, Scutts, Akasala, and Fernandez never testified that their

managers shaved their time—despite repeated questions about their off-the-clock claims.[27]  Nor

did they allege that their managers refused to approve timesheets reflecting overtime already

worked, or pressured them to remove time they had entered on their timesheets.  Instead,

Plaintiffs only allege that overtime hours would not be approved in *advance* of actually being

worked, or that only limited overtime hours would be pre-approved.[28]

---

[23] Deposition Of David Fernandez ("Fernandez Dep."), Ex. A-2, at 12:5-13:14; Deposition Of Joseph Scutts ("Scutts Dep."), Ex. A-3, at 60:16-60:17.

[24] As an FS, Scutts was paid for a significant amount of overtime work between November 2007 and July 2008; four paychecks reflected pay for 20 hours or more in overtime compensation.  *See* Excerpts from Scutts' payroll records, Ex. M-32, at Scutts 000111 - Scutts 000145.  Similarly, Fernandez was compensated for 43.33 hours of overtime in March 2008, and for 21.74 hours in June, 2008.  *See* Excerpts from Fernandez's payroll records, Ex. M-22, at Fernandez 000037 - Fernandez 000049.  Likewise, Osvaldo Lee, as a PB, received more than six hours' overtime compensation in an eight-week period in 2011.  *See* Excerpts from Lee's timekeeping records, Ex. M-31, at Osvaldo 000289; Excerpts from Lee's payroll records, Ex. M-27, at Osvaldo 000183.  Akasala also received overtime compensation throughout 2010 and 2011, including 10.5 hours on one paycheck.  *See* Excerpts from Akasala's payroll records, Ex. M-29, at Akasala 000274 - Akasala 000320.

[25] *See* Fernandez Dep., Ex. A-2, at 116:11-117:6 (in which Fernandez testified that he was unable to recall whether he had conversations with any of his managers regarding off-the-clock marketing activities).

[26] Deposition of Jim Akasala ("Akasala Dep."), Ex. A-1, at 39:21-39:23.

[27] Akasala first alleged that managers shaved his time in his February 7, 2013 declaration—just two days after being deposed in this case.  *See* Ex. 1 to Plaintiffs' Motion at ¶ 20.

[28] *See* Plaintiffs' Motion at 20.

Fourth, unlike *Winfield*,[29] there is no significant evidence in this case regarding other employees working off the clock.  When pressed to identify other PBs or FSs who suffered from the widespread policy, Scutts and Fernandez testified they never heard complaints from any of their co-workers, while Akasala could only recall two other individuals.[30]  Fifth, plaintiffs in *Winfield* submitted company emails demonstrating *unequivocally* that management was aware of the off-the-clock work.  Here, Plaintiffs have not submitted any similar emails.  Instead, they rely on one email which states, "Please note that when working a Saturday you will flex your time during the week as OT is no longer permissible."[31]  But this email expressly instructs Plaintiffs to "flex" their time—*i.e.*, that if they have to work extra time on one day, they should arrive to work later or leave earlier on another day that week.[32]

Sixth, the plaintiffs in *Winfield* presented evidence that they had nationwide, uniform sales goals proportional to Personal Bankers' salaries. *Winfield*, 843 F. Supp. 2d  at 404.  In this case, however, the putative class members had (for the FSs) and currently have (for the PBs) widely differing performance goals.  The sales goals for both FSs and PBs vary depending on

---

[29] In *Winfield*, the Plaintiffs "recounted statements made by others, namely statements by other Personal Bankers that they were not paid for all overtime hours worked." *Id.* at 403.  Three plaintiffs also testified they were aware of other Personal Bankers who similarly worked overtime and were not always compensated for that time. *Id.*

[30] *See* Fernandez Dep., Ex. A-2, at 105:16-106-11 (Fernandez never asked his co-worker whether he logged time for opening procedures or call nights, even though he claims he was not paid for that time); Scutts Dep., Ex. A-3, at 137:15-139:19 (Scutts does not recall any of his co-workers complaining that they were not paid for opening and closing procedures, marketing work, call nights, meetings, or telephone conferences); Akasala Dep., Ex. A-1, at 29:6-32:6 (Akasala alleges he spoke with two co-workers, Juan and Robert.  Akasala cannot recall Robert's last name, email address, where he works, or marital/family status even though they still keep in touch.  Akasala does not keep in touch with Juan and does not recall his last name.).  *See also Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *6 (E.D. Wis. Sept. 11, 2008) (noting that lack of personal knowledge concerning other putative class members rendered statements in affidavit conclusory and insufficient).

[31] Ex. 70 to Plaintiffs' Motion.

[32] Further, this email does not suggest that its recipients would not be paid for overtime if they worked it.  In fact, despite receiving this email on May 26, 2010, Akasala worked—and was paid—overtime shortly thereafter during the week of July 12, 2010.  *See* Excerpts from Akasala's timekeeping records, Ex. M-28, at Akasala 000267; Excerpts from Akasala's payroll records, Ex. M-29, Akasala 000298.

13

their experience and specialization.[33]   Some FSs/PBs also specialized in investments, small

business accounts, or servicing wealthier customers and therefore have different performance

goals.[34]   FSs' sales goals also varied by store based on store age, historical performance, and

local demographics, including household density, the number of small businesses in the area, and

average household income.[35]

The evidence in *Winfield* also suggested that employees there were automatically

counseled and disciplined if they failed to meet the sales quotas.  *Winfield*, 843 F.Supp. 2d  at

404.  Although Plaintiffs here imply that the same occurred at Wachovia and Wells Fargo, this is

not the case.  Instead, employees who fail to meet performance targets are coached and retrained

over a period of time—to help them reach their goals—before they are subject to counseling or

discipline.[36]  Notably, despite Plaintiffs' claims that they either had to work off the clock or risk

discipline and termination, there is no evidence (apart from their current, revised declarations)

they ever reported these concerns to Wells Fargo.[37]

---

[33] "Rookie" or new FSs who were on the job six months or less had lower sales goals than more tenured FSs. *See* Declaration of Scott Jackson (hereinafter "Jackson Decl."), Ex. K, ¶ 26.  Less experienced PBs (or PB1s) have sales goals focusing on high-volume products such as opening new checking accounts whereas more experienced PBs (or PB2s) have sales goals focusing on high-value products such as loans.  *Id.* at ¶ 45.

[34] *Id.* at ¶¶ 27, 44.  For example, FSs/PBs who are licensed/registered have investment-related sales goals whereas traditional FSs/PBs do not.  *Id.*

[35] *Id.* at ¶¶ 22-24.

[36] *See, e.g.*, Zaretha Brown Decl, Ex P-39, ¶ 13; *see also* Deposition of Tom DeBesse ("DeBesse Dep."), B-4, at 159:7-20 ("Q:  Well, if a personal banker continues to fall short of the -- the targets or the goals, what would happen to him or her? … A:  Well, I think any team member, with respect to their job performance, if they weren't meeting the requirements of their job performance, there would be a period of coaching, there would be a period of evaluation with coaching, maybe retraining in particular areas.  There would be a lot of evaluation around that team member to help them get better in their positions.").  In fact, company policy does not even recommend counseling unless they fail to meet their sales goals for three consecutive months without any indication of improvement.  And even then they would be counseled several times before being subject to formal disciplinary measures.  Jackson Decl., Ex. K, ¶ 35.

[37] Plaintiffs were asked repeatedly during their depositions about their claims and the reasons they allegedly worked off the clock, but never once alleged in their depositions that they told any of their supervisors or manager, or that they complained to the HR department, that they were working off the clock to meet the performance goals or to avoid disciplinary action—despite having multiple avenues to complain, including making an anonymous complaint.  *See, e.g.*, Excerpts From My Time Online Resource Guide, Ex. M-1, at WF 003469; Wachovia's

14

Seventh, there was no evidence in *Winfield* about the way the company set the performance goals for the employees.  Here, Plaintiffs assert in conclusory fashion that their performance goals were "unattainable."[38]  But the fact is that Wachovia and Wells Fargo set performance goals based on various objective factors so that employees could reach them.  At Wachovia, for example, performance goals varied based on region, store, and type of FS.[39]  For example, FSs in low-growth, low-opportunity stores had lower goals than FSs in high-growth, high-opportunity stores.[40]  FSs in established regions, such as New York, had lower goals than FSs in growth regions.[41]  Wachovia also looked at store age, historical performance, and local demographics—including household density, the number of small businesses in the area, and average household income—when setting performance for FSs' goals.[42]  In this way, Wachovia knew that the goals set for each FS were realistic.

Wells Fargo also sets realistic goals for its PBs.  As noted above, performance goals for PBs vary based on their experience and specialization.[43]  Wells Fargo branches are then staffed based on the number of PBs necessary to meet each branch's goals.[44]  Low-growth, low-opportunity branches have lower goals and are staffed with fewer PBs than high-growth, high-

---

Dispute Resolution Policy, Ex. M-2, WF 002291 - WF 002294; Excerpts From Wells Fargo's 2007-2011 Handbooks For Team Members, Ex. M-5 to M-10, at WF 000064, WF 000228 - WF 000229, WF 000394 - WF 000395, WF 000545, WF 000686 - WF 000687, WF 000833 - WF 000834.  Moreover, although each Plaintiff had multiple opportunities to make comments on their yearly performance evaluations, they never once commented on those forms that the goals were unrealistic or unattainable, or that that they were working off the clock to meet those goals—even though they made numerous other comments on their evaluations.

[38] *See* Plaintiffs' Motion at 20.

[39] *See* Jackson Decl., Ex. K, at ¶ 20.

[40] *Id*. at ¶ 23.

[41] *Id*. at ¶ 21.

[42] *Id*. at ¶¶ 22-24.

[43] *Id*. at ¶ 43.

[44] *Id*. at ¶ 46.

15

opportunity branches.[45]  This ensures that branches are not over- or under-staffed so that each PB has a level playing field from which to attain his/her performance goals.  Because Wachovia and Wells Fargo used objective factors to set realistic performance goals, it is no surprise that putative class members did not feel pressure to work off the clock to meet their performance goals and that many could meet those goals without working overtime, as the attached declarations from multiple FSs and PBs demonstrate.[46]

Unlike *Winfield*, Plaintiffs' claims here more closely resemble *Eng-Hatcher v. Sprint Nextel Corp.,* No. 07 Civ. 7350(BSJ), 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009).  In *Sprint*, the plaintiff alleged that the defendant employed a "*de facto* policy" in which defendants tried to limit overtime hours but incentivize goal achievement, which allegedly resulted in class members working off the clock.  *Id* at *3.  But the court observed that plaintiff's actual evidence was lacking:

> [W]hile the Plaintiff claims that Sprint's de facto policy causes dozens, if not hundreds, of Sprint managers in practice to violate Sprint's clear, lawful written policies, she merely presents her own deposition testimony as proof of these allegations.  In her deposition, Plaintiff identifies five other [class members] by name, employed at the same stores as Plaintiff, that she claims told her that they also did not receive pay for overtime worked.  [Plaintiff] provides no details about these conversations, and provides no affidavits corroborating her claims.  This reliance on limited anecdotal hearsay does not persuasively show that Sprint likely has a common plan or practice, implemented through individual store managers, requiring [class members] to work uncompensated overtime at many of its 1,200 locations.

---

[45] *Id*.

[46] *See generally* Exs. O-11 and Q-11, Comparison Among Declarants Regarding Performance Goals.  According to Michael Nelson, a former FS in White Plains, NY: "I believe the performance goals at Wachovia for Financial Specialists were challenging … But in my experience, I did not have to regularly work extra or harder to meet those goals. And I never felt pressure to work additional hours or to work off the clock to meet my goals. I worked flexible hours or additional hours to accommodate my clients, not because the performance goals were/are very difficult."  Nelson Decl., Ex. N-8, ¶ 13.

*Id.* (footnotes omitted).  The Court denied collective action certification, holding that "broad, conclusory allegations…offer nothing of evidentiary value to support a finding that a factual nexus exists" between the manner in which plaintiff and other employees received compensation.  *Id.* at *8.[47]

## C.  Plaintiffs' Evidence Does Not Support A Regional Or State-Wide Class Or Collective Action.

### 1.  Plaintiffs' Reliance On Job Descriptions/Postings Is Misplaced And Does Not Establish An Unlawful Policy Concerning Marketing Activities.

Plaintiffs attached to their Motion job descriptions for the PB and FS positions along with approximately 60 nearly-identical job postings for open PB positions in various locations throughout the Northeast Region, claiming that they constitute evidence that Wells Fargo has a policy requiring PBs and FSs to perform offsite marketing work without compensation.[48]  In particular, Plaintiffs cite the portion of the job descriptions and job postings explaining that "Bankers reach out into the community by placing outbound phone calls to existing clients, visiting businesses, conducting educational seminars, and being active in the community."[49]  But this is only a description of job <u>duties</u>—it says nothing about having to do these activities off the clock.  To the contrary, the fact that marketing activities are listed <u>along with other compensable job duties</u> indicates that Wells Fargo's policy is to pay for that work.[50]

---

[47] *See also Morales v. Plantworks, Inc.*, No. 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267, 5-6 (S.D.N.Y. Feb. 1, 2006) (denying certification where the only support for plaintiffs' claim that they are similarly situated came from their conclusory allegation that "there are over 20 current and former employees that are similarly situated to Plaintiffs").

[48] *See* Plaintiffs' Motion at 12-13 and 25, and Exs. 21, 22, and 24(A)-(E).

[49] *See* Plaintiffs' Motion at 13, 25.

[50] Plaintiffs cite *Francis v. A &E Stores, Inc.*, *Cohen v. Lehrman Grp., Inc.*, and various other cases (see Plaintiffs' Motion at 36-39) for the proposition that the job descriptions and job postings they attach to their Motion are sufficient to establish a state or region-wide unlawful policy because they show that all FSs and PBs have essentially the same duties.  But those cases lack any relevance here; they <u>all</u> involved FLSA misclassification claims—not off-the-clock allegations.  The issue in those cases was whether the putative class members were properly classified as exempt under the FLSA; and thus, under Section 216(b), the issue was whether a class of employees existed who

15365981v.1

The Banks' official policies provide that FSs/PBs shall be paid for all hours worked, including time spent performing offsite marketing activities. Wells Fargo's managers even go through training that specifically addresses this very issue—*i.e.*, managers are trained that PBs must be paid for offsite marketing activities.[51] Moreover, the attached declaration testimony from numerous former FSs and current PBs confirms that in New York and the Northeast Region, not all FSs/PBs performed offsite marketing, but those who did were and are regularly compensated for that time—whether they do it during their shifts or outside their regularly-scheduled shifts.[52] Further, not all FSs/PBs perform(ed) offsite marketing activities. As one of Wells Fargo's District Managers in the *Richardson* case explained, many PBs are successful without ever leaving the banks: "Is it required that they go outside of the bank and market our company, absolutely not. **We have plenty of bankers that never leave the store and are absolutely as successful as they could be.**"[53]

---

performed the same job duties (and were therefore similarly misclassified). Hence, the job postings were relevant because they showed that the plaintiffs were performing similar duties and were therefore similarly situated.

The same reasoning does not apply here—*i.e.*, Plaintiffs are not suing because they were misclassified, and thus, examining their job duties will not determine whether Wells Fargo or Wachovia is liable for violating the FLSA or NY overtime law. This exact same observation has been made by other courts. *See, e.g.*, *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653, at *13-14 (N.D. Ga. July 25, 2006) (In an off-the-clock case, the court noted: "**Liability cannot be determined by considering the employee's job duties**. Rather, every employee must testify about his awareness of the overtime policy, and his violation of that policy -- and whether it was compelled by his or her branch manager.") (emphasis added); *White*, 204 F. Supp. 2d at 1314 (In an off-the-clock case, a plaintiff must show a "commonality between the basis for his claim and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions, because without such a requirement, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse").

[51] *See* Excerpts From Wells Fargo "Managing Within The Law" Training Guide (May 4, 2010), attached as Ex. C-4, at WF 001028 ("Be aware that requiring non-exempt Team Members to volunteer in activities benefiting Wells Fargo can result in overtime pay. If you have non-exempt Team Members working a booth at a community event — handing out sales brochures, answering sales questions — this is considered work related and must be entered into WebTime.").

[52] *See generally* Exs. O-8 and Q-8, Comparison Among Declarants Regarding Outside Marketing.

[53] DeBesse Dep., Ex. B-4, at 186:14-186:17 (emphasis added); *see also id.* at 188:16-188:23 ("Q: … [W]as it a job requirement of personal bankers that they visit businesses, conduct -- conduct educational seminars and be active in the community? A: It is not a requirement that the bankers do every one of these things, no."). This testimony is

18

## 2. Plaintiffs Unfairly Cite Out-Of-Context Testimony From Wells Fargo's Payroll Manager.

Plaintiffs selectively quote the deposition of Teresa Swanson (Vice President of Payroll and Human Resources Data Services)[54] to make it appear as though Wachovia and Wells Fargo do not pay for offsite marketing. Yet Swanson's actual, complete testimony refutes any such suggestion.[55] First, Swanson explained numerous times to Plaintiffs' counsel that she is in the Payroll Department and has no personal knowledge of PBs' day-to-day activities.[56] Nevertheless, Swanson testified that "**If [PBs are] working, they should be logging their time.**"[57] Plaintiffs did not include this testimony in their Motion. Thus, set forth below is the complete portion of Swanson's testimony on this issue:

A: "Reaches out in community by visiting businesses, making outbound calls to customers, and being visible and active in (the) community."

Q: Is that time that should be paid through the timekeeping system at Wells Fargo?

A: **If they're working, they should be logging their time**.

Q: The job duties that are described in bullet four that you just read (out loud), is that time that should be paid for by Wells Fargo?

A: Yeah, I don't know because I don't know what they are asking them to do.

Q: Okay. Let's go through it. "Reaching out in the community by visiting businesses." Okay. Is that time that they should be paid for?

---

also supported by the attached declaration testimony from a number of FSs/ PBs who testify that not all FSs/PBs perform offsite marketing activities. *See* note 52, *supra*.

[54] *See* Swanson Dep., Ex. B-1, at 63:2-13.

[55] Although Plaintiffs suggest that Swanson's testimony here relates to FS and PB job duties, Swanson was only identified as a 30(b)(6) witness for Wells Fargo, not Wachovia. *See* Swanson Dep., Ex. B-1, at 6:1-8. Moreover, her testimony in this context was limited to a discussion about PB job duties, not FS job duties. *Id*. at 187:20-23 (wherein counsel for Plaintiffs asked Swanson about a PB job description).

[56] *Id*. at 63:2-64:4 (wherein Swanson explains that she is Vice President of Payroll and Human Resources Data Services and that she is responsible for overseeing the functional side, as opposed to technical aspects, of Wells Fargo's timekeeping and attendance systems); *id*. at 188:25-189:7 (explaining she has no specific knowledge regarding PB job duties in the job description); *id*. at 191:3-191:13 (Q: So reaching out in the community by visiting businesses, that's time that should be paid? … A: If I knew what they meant when they wrote that, I could answer it; but since I don't know what they mean, I cannot answer that and give any kind of good answer for it.") (counsel's objections omitted).

[57] *Id*. at 188:22-188:23 (emphasis added).

19

A:     Yeah, I don't know what context, I don't know what they're doing.  That is not anything we -- this isn't mine.  **I don't know anything about this.**

Q:     Visiting businesses, "Reaching out in the community by visiting businesses."   Is that something that they should be paid for?

A:     **We tell people to record all their working time**.

…

A:     I still can't answer it any different.  I don't know if by reaching out in the community or visiting a business is going to Subway for lunch.  I don't know what that means.  I have no interpretation of that.  **Any work time should be logged.**[58]

As this shows, although Swanson was not familiar with the job duties of PBs (because that is not her job), her testimony here is consistent with Wells Fargo policy that PBs should be paid for all their hours worked—regardless of the particular work activity.   Plaintiffs' attempt to mischaracterize Swanson's testimony again highlights the lack of evidence of any unlawful policy—regional or otherwise.

### 3.     Plaintiffs' Timekeeping Records And Their Mischaracterization Of Testimony Do Not Establish An Unlawful Policy Concerning Opening And Closing Procedures.

**Timekeeping records.**  Plaintiffs allege that the Banks have/had a policy of not paying FSs/PBs for the time they spend on opening or closing procedures before and after the banks open or close to the public.  Unable to produce any evidence of such a policy (beyond their own conclusory declarations), Plaintiffs instead assert the non sequitur that if their timecards shows that they were paid starting at 8 a.m. or ending at 6 p.m., then this means that they actually began work (without pay) before 8 a.m. or continued working after 6 p.m. doing opening or closing procedures.[59]   And conveniently, the argument goes, all that needs to be done to calculate Plaintiffs' unpaid hours worked for these tasks is to add up the number of times on their time cards that show they clocked in at 8 a.m. or clocked out at 6 p.m., and for each of those days add

---

[58] *Id*. at 188:13-190:20 (counsel's objections omitted and emphasis added).
[59] *See* Plaintiffs' Motion at 22-23.

an additional 15-30 minutes for unpaid opening or closing duties.   Yet this contention is demonstrably false.

First, unlike Plaintiffs' unfounded assertion, Wells Fargo <u>can</u> demonstrate from the timekeeping records that the Plaintiffs did clock in and out  <u>before and after</u> the banks opened and closed—on a consistent basis in some cases.  For example, between January 2010 and June 2010, Fernandez clocked out after his bank closed on approximately 59 days, typically at 6:15 p.m. or 6:30 p.m., but sometimes as late as 8 or 9 p.m.[60]  Fernandez's timekeeping records also show that on multiple occasions he clocked in before the bank opened, typically at 7:45 a.m., but sometimes also at 7:15 a.m. and 7:30 am.[61]  The timekeeping records of other Plaintiffs also demonstrate that they clocked in and out <u>before and after</u> the banks opened and closed.[62]

Second, Plaintiffs' deposition testimony refutes this argument.  Plaintiff Fernandez conceded that he was paid (at least sometimes) for opening and closing procedures.[63]  And plaintiff Scutts never mentioned closing procedures among the off-the-clock work that he claimed to have performed, despite being asked several times during his depositions to list and describe all such off-the-clock work.[64]

---

[60] *See* Excerpts from Fernandez's timekeeping records, Ex. M-21, at Fernandez 000260 - Fernandez 000263.

[61] *See id.*

[62] Between January 2010 and August 2011, Scutts clocked out at 6:30 p.m. or later 100 times.  *See* Excerpts from Scutts' timekeeping records, Exs. M-30 to M-31, at Scutts 000304 - Scutts 000362.  Between January 2010 and March 2011, opt-in plaintiff Osvaldo Lee clocked out after 6 p.m. on more than 130 occasions—typically at 6:30 p.m., but sometimes as late as 7 p.m., and once at 8:30 p.m.  *See* Excerpts from Lee's timekeeping records, Ex. M-25 to M-26, at Osvaldo 000269 - Osvaldo 000290.  At Wachovia, Lee often clocked in prior to the branch's 8 a.m. opening, clocking in between 7:30 and 7:45 a.m. 31 times in 2009.  *See id.* at Osvaldo 000249 - Osvaldo 000253.

[63] *See* Fernandez Dep., Ex. A-2, at 101:3-103:3 (wherein, after reviewing some of his timekeeping records, Fernandez admits his supervisors at Wells Fargo sometimes scheduled him to start his shift before the bank opened and that gave him "plenty of time … to conduct opening procedures"); *see also id.* at 121:15-123:7 (wherein Fernandez claims he sometimes got permission to start his shift before the bank opened to prepare the store for visits from corporate representatives); *id.* at 85:4-85:11 (Q:  If your time sheets reflected that you clocked out at 6:30 p.m., would that indicate that you were paid for that closing time?  A:  If my time sheet reflected that I clocked out at 6:30, then yes, I would get paid for that, because that would have been on the schedule.").

[64] *See* Scutts Dep., Ex. A-3, at 99:17-101:12 (wherein Scutts summarizes all of his alleged off-the-clock activities and does not list closing procedures).

Third, Plaintiffs' reference to the number of days that they clocked out at 6 p.m. to prove that they were not paid for closing procedures is disingenuous.[65]  When presented with their timekeeping records, Scutts and Fernandez testified during their depositions that they could not identify any specific days when they arrived earlier or stayed later than what the timecards actually show.[66]  For this reason, there is no basis to suggest that Plaintiffs in fact performed opening or closing duties on any of the days on which their time cards show they clocked in at 8 a.m. or clocked out at 6 p.m.  As the Plaintiffs themselves testified, there were other employees at each bank (including Tellers, managers, and other FSs/PBs) who likely opened or closed on those days.[67]  And that is exactly what happened—on the days Plaintiffs' timecards show them clocking in at 8 a.m. or clocking out at 6 p.m., the work schedules that were distributed ahead of time reveal that other employees were responsible for opening and closing the banks.[68]

**Mischaracterized Testimony.**    Plaintiffs also cite the deposition testimony of Constantine Santiano, a former Wells Fargo District Manager from the Houston, Texas area

---

[65] Plaintiffs' Motion at 22-24, and Exs. 32, 33, 60, 61, 62, and 63 to Plaintiffs' Motion.

[66] *See* Scutts Dep., Ex. A-3, at 116:14-25 ("Q:  Is it fair to say that for any of these time entries here that you couldn't tell me whether or not you showed up early on any of those days?  A:  A lot of times I come in earlier.  Q:  But you can't pinpoint any specific day on this sheet where you showed up early; is that correct?  A:  I can't tell you from two years ago or a year and a half ago, but there were days."); *see also id.* at 117:19-118:2 ("Q:  Is it fair to say that for any of these times when you clocked out that you don't know whether or not you stayed late those days, you can't pinpoint any specific date?  A:  It could very well have been.  Q:  You just don't know  A:  No."); Fernandez Dep., Ex. A-2, at 53:18-53:24 ("Q:  How many times to you recall her scheduling you to work on your schedule before 8 a.m.  A:  I don't recall."); *see also id.* at 90:17-90:22 ("Q:  So what is your explanation as to why these lunch times, these meal breaks are all different; some say 5 minutes, some say 10 minutes, some say one hour, some say 15 minutes?  A:  Again I don't recall."); *id.* 92:19-92:21 ("Q:  How often would your call nights be on the schedule?  A:  I don't recall exactly how often …").

[67] *See* Fernandez Dep., Ex. A-2, at 76:2-76:6 (Fernandez worked with one other FS/PB and five Tellers).

[68] In March 2010 and April 2010, for example, the work schedules circulated to plaintiff Akasala and his co-workers show that other employees (not Akasala) were scheduled to open the bank at 7:30 a.m. (before the bank opened at 8 a.m.) and that other employees were designated to close the bank—but not Akasala.  *See* March 2010 and April 2010 Schedules Including Akasala, attached here to as Ex. C-5.  Similarly, the work schedules circulated to plaintiff Scutts and his co-workers for February 2010 and March 2010 show that other employees were scheduled to open and close the branch.  *See* February 2010 and March 2010 Schedules Including Scutts, attached here to as Ex. C-6. (showing that there were at least two employees on the schedule each day opening the branch at 7:30 a.m. and at least two scheduled to work until 6:30 p.m. to close the branch).

(who never worked in New York or the Northeast Region) to make it appear as though all FSs perform opening and closing procedures.[69]  But this is not at all what Santiano said.  Instead, he testified unambiguously that FSs did not typically perform opening or closing procedures:[70]

> Q:  The two team members…that would be involved in the opening procedures, would one of those or maybe both of those people be financial specialists?"
>
> A:  **No, not typically.**
>
> Q:  Would a financial specialist **sometimes** be involved in the opening procedures?
>
> A:  On a need basis, yes.[71]

Santiano's testimony here is consistent with the declarations of numerous putative class members in New York and the Northeast Region who directly refute Plaintiffs' claims.[72]  Some former FSs and current PBs testify that they were or are not required to perform opening or closing procedures, and thus, those FSs/PBs are not similarly situated to the Plaintiffs.[73]  Many other FSs/PBs testify that they were or are <u>always</u> paid for opening and closing procedures.[74]

---

[69] *See* Plaintiffs' Motion at note 37 and accompanying text (citing Santiano Dep., Ex. 6 to Plaintiffs' Motion, at 96, 11-18).  Although Plaintiffs imply here that Santiano testified that all FSs *and* PBs perform opening and closing procedures, his testimony in this section refers only to FS job duties.

[70] Plaintiffs also cite Wells Fargo standard Opening and Closing Procedures in support of their conclusory allegation that all PBs are similarly situated and are required to perform those duties. *See* Plaintiffs' Motion at 9.  But these standard procedures do not apply to any one particular position (nor do Plaintiffs argue otherwise).  They are procedures that employees in different positions (including tellers, personal bankers, service managers, etc.) are required to follow.  And, like the generic job descriptions on which Plaintiffs also rely, they say nothing about having to do these activities off the clock.

[71] *See* Santiano Dep., Ex. B-2, at 96:11-18.

[72] *See generally* Exs. O-5 to O-6 and Q-5 to Q-6, Comparison Among Declarants Regarding Opening and Closing Procedures.

[73] *See generally* Exs. O-5 to O-6 and Q-5 to Q-6, Comparison Among Declarants Regarding Opening and Closing Procedures.  According to Andrew Malhotra, a former FS from New York: "During the entire time that I have worked at the New Rochelle branch I have not been responsible for performing any branch opening or closing procedures … As a banker, it is not my responsibility to perform opening or closing procedures as these tasks, such as opening the vault, are part of the bank tellers responsibilities."  (Malhotra Decl., Ex. N-1, ¶¶ 11, 13).

[74] *See generally* Exs. O-5 to O-6 and Q-5 to Q-6, Comparison Among Declarants Regarding Opening and Closing Procedures.  According to Deborah Raukohl, a former FS in White Plains, NY: "I would log on my time the time when I started the opening procedures and I was always paid for that time prior to the time that the bank opened. If I participated in closing procedures, I would log that time on my timecards as well and I was paid for that time." (Raukohl Decl., Ex. N-3, ¶ 7).

23

**4.    Plaintiffs' Claims Regarding Automatic Deductions For Lunch Breaks Are Demonstrably False And Were Rejected By Judge Atlas In *Richardson*.**

Plaintiffs claim that all FSs/PBs "consistently worked through all or a portion of their uncompensated meal breaks" because Wachovia and Wells Fargo "automatically deducted" time for lunch—whether they took a lunch break or not.[75]   But this allegation is demonstrably false. First, neither Wachovia nor Wells Fargo used an auto-deduct timekeeping system during the relevant time period.[76]   Instead, under the timekeeping systems, employees either had to actively input their lunch breaks into their timecards or, if their lunch time was already prepopulated into their timecards (which depended on the time period, the particular location, and the system), the employee had to certify that the lunch break on the timecard reflected the actual duration of their breaks before submitting his/her timecard for payment.[77]   Either way, the employee was supposed to track and log his/her lunch breaks accurately.[78]   Plaintiff Fernandez's testimony is consistent with this understanding—he said the timekeeping system allowed him to clock in and

---

[75] *See* Plaintiffs' Motion at 24.

[76] *See* Declaration of Shawn DeNicholas ("DeNicholas Decl."), Ex. J, ¶¶ 14-18.  If an employee had four clock punches a day, then the time between the second and third clock punches was recorded as a meal break.  If the employee only had two clock punches a day (i.e. clock in at 8 a.m. and clock out at 5 p.m.), then a meal break would not be recorded.").  *See* Declaration of Teresa Swanson ("Swanson Decl."), Ex. L, ¶ 8 (explaining the Webtime and TimeTracker systems: "Because Wells Fargo stopped using the live feeds from Click2Staff to prepopulate any employee timecards by January of 2010, the timecards of Personal Bankers who worked for Wells Fargo in New York State or the Northeast Region—including plaintiffs Jim Akasala, David Fernandez, Joseph Scutts, and Osvaldo Lee—were never prepopulated with schedules from Click2Staff.")

[77] Wells Fargo's timekeeping policy required PBs to record their actual hours worked—even if their schedules were prepopulated into Webtime.  Thus, if a PB's timecard was prepopulated, before submitting the timecard to payroll for processing, the employee was required to affirm that his or her timecard was correct and that it accurately reflected the PB's hours worked.  *See* Swanson Decl., Ex. L, ¶¶ 4, 6 (explaining the Webtime and TimeTracker systems); DeNicholas Decl., Ex. J, ¶ 14 (explaining the My Time systems: "My Time calculated the employees' time worked based on the actual clock entries—not the shift patterns.").

[78] *See* Excerpts From Wells Fargo's 2011 Team Member Handbook, Ex. C-2, at WF 000828 ("Defendant Wells Fargo has clear written policies mandating accurate recordkeeping of employee's time and payment of overtime when worked outside scheduled shifts or during lunch time.").

clock out to track the actual time he took for lunch.[79]  In fact, Fernandez's time records show that when he took a shorter lunch period he only clocked out for 5-, 10-, or 15- minutes.[80]

Second, Plaintiffs allege that their timekeeping records affirmatively show automatic deductions of 15 or 30 minutes from their timecards on multiple occasions and that "[n]one of the pay records show the Plaintiffs working a full weekday without the deduction of a meal break."[81]  But these allegations are also demonstrably false and simply highlight Plaintiffs' lack familiarity with the relevant timekeeping records.  All of the dates Plaintiffs cite in their Motion are from 2010 when they were using the Wells Fargo Webtime system to record their time.[82]  As noted above, Wells Fargo's timekeeping system did not make any automatic deductions.  Moreover, Wells Fargo stopped prepopulating employee timecards by January 2010, so Plaintiffs' time cards were never prepopulated with their schedules.[83]

Third, despite the Plaintiffs' claims, numerous declarations from other FS/PBs in New York and the Northeast Region demonstrate that (1) they did not have time automatically deducted from their timecards; (2) they usually did not work during lunch; and (3) if they did

---

[79] *See* Fernandez Dep., Ex. A-2, at 71:15-72:3 ("Q:  The [Wells Fargo timekeeping] system allowed you to put in your start time and your clock out for lunch and then put in when you came back from lunch and then allowed you to clock out at the end of the day?  A:  That is correct.").

[80] *See* Excerpts from Fernandez's timekeeping records, Exs. M-20 to M-21, at Fernandez 000208-000216, Fernandez 000260-000266 (reflecting more than 300 occasions from February 2008 to December 2010 in which Fernandez recorded a lunch of 15 minutes or fewer).

[81] *See* Plaintiffs' Motion at 24-25 and notes 161-163.

[82] Plaintiff try to argue on page 24 that My Time auto-deducted for their lunch breaks, but this statement is also false.  *See* DeNicholas Decl., Ex. J, ¶¶ 19-21.  ("I read page 24 of Plaintiffs' Motion for Class Certification where Plaintiffs quote Ex. J-4.  Plaintiffs misquote the My Time Reference Materials when they quote 'the payroll system [would] automatically generate pay based on an employee's regular scheduled hours' for the proposition that employees were only paid for their scheduled hours.  This quote refers to the timing of employees' compensation, not the amount of their compensation.").

[83] Prior to the Wells Fargo and Wachovia merger, Wells Fargo did not have any community banking branches in New York State or the Northeast Region—there were only Wachovia branches.  PBs who were employed at former Wachovia legacy bank branches began using the Webtime timekeeping system in January 2010.  Because Wells Fargo stopped using the live feeds from Click2Staff to prepopulate any employee timecards by January of 2010, the timecards of PBs who worked for Wells Fargo in New York State or the Northeast Region—including plaintiffs Jim Akasala, David Fernandez, Joseph Scutts, and Osvaldo Lee—were never prepopulated with schedules from Click2Staff.  *See* Swanson Decl., Ex. L, ¶ 8.

25

occasionally work during lunch, they logged that time on their timecards and were always paid for that time.[84]

## D.   The Attached Declarations From Other Personal Bankers Refute Plaintiffs' Claims.

Plaintiffs' claims are based only on their individual experiences working for Wachovia or Wells Fargo within a one-half square mile area of midtown Manhattan.  Yet the attached declarations of 40 former FSs and current PBs from New York and the Northeast Region conclusively rebut the Plaintiffs' allegations, as well as any suggestion that their experiences were common to the putative class.  In fact, some of Plaintiffs' own co-workers—*i.e.*, other FSs/PBs who worked at the same bank branches and/or the same district (Manhattan) where the Plaintiffs worked and under the same managers—directly contradict Plaintiffs' claims.  The following summaries contain only a few examples of the putative class members' experiences that directly refute the Plaintiffs' claims.  The remaining examples are outlined in summary fashion in charts attached to this brief as Exhibits O and Q.

**They could/can meet their performance goals generally within 40 hours and were/are not pressured to work off the clock to meet their performance and bonus targets[85]**

- Michael Nelson, a former FS in White Plains, NY: "I believe the performance goals at Wachovia for Financial Specialists were challenging … But in my experience, I did not have to regularly work extra or harder to meet those goals. And I never felt pressure to work additional hours or to work off the clock to meet my goals. I worked flexible hours or additional hours to accommodate my clients, not because the performance goals were/are very difficult."  (Nelson Decl., Ex. N-8, ¶ 13).

**They record(ed) the hours they actually worked; the schedules they receive(ed) ahead of time are only a guide for staffing purposes:[86]**

- Deborah Raukohl, a PB in White Plains, NY: "At [Wells Fargo], the work schedule were and are used for scheduling and staffing purposes. None of my managers have ever told me that the work schedules are meant to be substitutes for accurate timekeeping or that I was required to log on my timecards only the hours that were noted for me on the

---

[84] *See generally*, Exs. O-7 and Q-7, Comparison Among Declarants Regarding Lunch Breaks.

[85] *See generally* Exs. O-11 and Q-11, Comparison Among Declarants Regarding Performance Goals.

[86] *See generally*  Exs. O-10 and Q-10, Statements By Declarants Regarding Timekeeping Policies and Procedures.

schedule. On the contrary, I logged on my timecards … the actual hours that I worked each day, clocking in and out as necessary, not simply the hours that were listed in my schedule." (Raukohl Decl., Ex. P-16, ¶ 6).

**They never had any time automatically deducted from their timecards:[87]**

- According to Keon Miller, a PB in Philadelphia, PA: "There are no automatic deductions made for my lunch break or for any other reason … I always take a 45 minute lunch when I work a regular shift. While my lunch time is on the schedule that I receive at the beginning of the month, 95% of the time I take lunch at a different time since I want to accommodate my customers." (Miller Decl., Ex. P-26, ¶¶ 10-11).

**They were/are paid for opening[88] and closing duties:[89]**

- According to Tod Davies, a PB in Philadelphia, PA: "While working as a Personal Banker from 2006 to 2012, I was occasionally involved in the opening and closing process of the bank … I was instructed to log all time spent opening and closing on my timesheet, and I was always paid for this time." (Davies Decl., Ex. P-35, ¶ 11.)

**They were/are paid for offsite marketing activities even outside their regular shifts:[90]**

- Giovanni Grande, a former FS from White Plains, NY: "At the Thornwood branch we sometimes have 'onsites' which is when we set up balloons, coffee and cookies and try to solicit business from certain individuals … During these 'onsites,' which are only held during regular bank hours, I stand with the teller in order to try and sell bank products to these individuals. We call this technique 'seller behind the teller' … I have also done a few 'offsites' which is when we go to a potential client to try and solicit business. I have only performed a few 'offsites' and for each one I did it during regular business hours and was paid for this time." (Giovanni Decl., Ex. N-4, ¶¶ 13-14).

**They typically did/do not work during their lunch breaks; if they did/do, they were/are paid for that time:[91]**

- Viet Nguyen, a PB in Philadelphia, PA: "At all three locations, I voluntarily decided to shorten my break in order to go back to work. Nobody ever told me I had to work or that I could not take a break. When I shortened my lunch, I always clocked back in, and recorded the time on my time sheet. Wells Fargo always paid me for this time." (Nguyen Decl., Ex. P-36, ¶ 10).

---

[87] *See generally* Exs. O-4 and Q-4, Comparison Among Declarants Regarding Call Nights.

[88] *See generally* Exs. O-5 and Q-5, Comparison Among Declarants Regarding Opening Procedures.

[89] *See generally* Exs. O-6 and Q-6, Comparison Among Declarants Regarding Closing Procedures.

[90] *See generally* Exs. O-8 and Q-8, Comparison Among Declarants Regarding Offsite Marketing.

[91] *See generally* Exs. O-7 and Q-7, Comparison Among Declarants Regarding Lunch Breaks.

**They were/are paid for call nights:**[92]

- Steven Thomas, a New York City, NY PB: "As a Personal Banker, I also have participated in a "call events," which are after-hours marketing initiatives when I stayed after the bank closes to call customers.  I always recorded the time I spent participating in "call events" on my timecard and I was paid for my time participating in these activities." (Thomas Decl., Ex. P-34, ¶ 9).

**They are paid for meetings and conference calls:**[93]

- Amy Lineberry, a PB in Connecticut: "I have always been paid for participating in these calls and other meetings, even when they were not listed on my schedule, because I record them on my timecard."  (Lineberry Decl., Ex. P-2, ¶ 11).

Under these circumstances, when Plaintiffs' own allegations are directly refuted by the putative class members, case law is clear that conditional certification should be denied.[94]  The same is true here and conditional certification should be denied for this additional reason.

**E.     As Judge Atlas Recognized, Plaintiffs' Off-The-Clock Allegations Will Require Numerous, Highly Individualized Inquiries**

As the following summary charts demonstrate, Plaintiffs' own contradictory deposition and declaration testimony regarding their off-the-clock work differs significantly and demonstrates why individualized, fact-intensive inquiries will be required for each putative class member.

---

[92] *See generally*  Exs. O-4 and Q-4, Comparison Among Declarants Regarding Call Nights.

[93] *See generally*  Exs. O-9 and Q-9, Comparison Among Declarants Regarding Conference Calls and Meetings.

[94] *See Brothers v. Portage Nat'l Bank*, No. 3:06-94, 2009 U.S. Dist. LEXIS 109769, at *2, 7-9 (W.D. Pa. Mar. 24, 2009) (denying certification because plaintiff's factual allegations regarding off-the-clock work were refuted or contradicted by employees in the same position); *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653, at *15 (N.D. Ga. July 25, 2006) (denying conditional certification and noting that plaintiffs did not meet "their burden of . . . showing of commonality of claims" where defendant submitted declarations from putative class members showing that they were always properly paid for overtime and always accurately recorded their time).

28

| | Scutts[95] | Fernandez[96] | Akasala[97] |
|---|---|---|---|
| **Opening Procedures** | 1. Unpaid.[135:14-135:21]. <br> 2. Usually unpaid.[¶ 12]. <br> 3. Required and usually unpaid.[¶¶ 10-11]. | 1. Paid for some.[101:3-103:3; 121:15-123:7]. <br> 2. Usually unpaid.[¶ 10]. <br> 3. Usually unpaid.[¶ 12]. <br> 4. Required and usually unpaid.[¶¶ 11-12]. | 1. Usually unpaid.[¶ 10]. <br> 2. Usually unpaid.[¶ 12]. <br> 3. Does not recall ever being paid.[56:15-56:17]. <br> 4. If it was not scheduled. it was unpaid.[¶ 33]. |
| **Closing Procedures** | 1. No allegation.[99:17-101:12]. <br> 2. Usually unpaid.[¶ 12]. <br> 3. Required and usually unpaid.[¶¶ 10-11]. | 1. Paid for some.[85:4-85:11]. <br> 2. Usually unpaid.[¶ 10]. <br> 3. Usually unpaid.[¶ 12]. <br> 4. Required and usually unpaid.[¶¶ 11-12]. | 1. Usually unpaid.[¶ 10]. <br> 2. Usually unpaid.[¶ 12]. <br> 3. Unpaid.[62:8-62:12]. <br> 4. If it was not scheduled, it was unpaid.[¶ 34]. |
| **Call Nights** | 1. Unpaid.[107:19-107:22]. <br> 2. No allegation. <br> 3. Two hours, multiple nights each month and generally unpaid.[¶ 14]. | 1. Paid for most.[93:11-94:9; 12:14-12:24]. <br> 2. No allegation. <br> 3. No allegation. <br> 4. Two hours, multiple nights each month and generally unpaid.[¶ 15]. | 1. No allegation. <br> 2. No allegation. <br> 3. 2-3 time a week; he did not record the time, so unpaid.[66:9-66:24]. <br> 4. Two hours, multiple nights each month and generally unpaid.[¶ 24]. |
| **Offsite Marketing** | 1. Twice a week for 4-6 hours; does not allege before shift or during lunch; sometimes received overtime approval for after-hours offsite marketing.[99:17-101:12]. <br> 2. Before shift and during lunch and usually unpaid.[¶¶ 4, 12]. <br> 3. Required outside of shift and overtime not approved.[¶ 23]. | 1. Off the clock 2-3 hours each week but <u>not during lunch</u>.[109:14-109:25; 115:20-116:5]. <br> 2. Usually unpaid.[¶ 10]. <br> 3. Alleges before shift and <u>during lunch</u> and usually unpaid.[¶¶ 4, 12]. <br> 4. Required outside of shift and overtime not approved.[¶ 24]. | 1. Usually unpaid.[¶ 10]. <br> 2. Alleges before shift and during lunch and usually unpaid.[¶¶ 4, 12]. <br> 3. Off the clock 4-5 hours each week, including calls from home, but not Sundays and not Saturdays when he was in school.[67:19-68:22, 74:24-77:10, 77:3-77:6]. <br> 4. Off the clock before and after shift and on weekends.[¶ 23]. |

---

[95] 1. Scutts was deposed on 9/12/2011 (Ex. A-3); 2. Scutts signed his first declaration on 11/14/2011 (Ex. R-8); and 3. Scutts signed his second declaration on 2/7/2013.

[96] 1. Fernandez was deposed on 9/12/2011 (Ex. A-2); 2. Fernandez signed his first declaration on 10/13/2011 (Ex. R-9); 3. Fernandez signed his second declaration on 11/10/2011 (Ex. R-6); and 4. Fernandez signed his third declaration on 2/7/2013.

[97] 1. Akasala signed his first declaration on 10/13/2011 (Ex. R-7); 2. Akasala signed his second declaration on 11/10/2011 (Ex. R-5); 3. Akasala was deposed on 2/3/2013 (Ex. A-1); and 4. Akasala signed his third declaration on 2/7/2013.

| | Scutts[95] | Fernandez[96] | Akasala[97] |
|---|---|---|---|
| **In-Person Meetings** | 1. Unpaid.[(66:5-66:21, 103:9-104:24)]. <br><br> 2. No allegation. <br><br> 3. Contributing factor to unpaid overtime.[(¶ 20)]. | 1. Paid when he arrived early to attend.[(14:18-15:9)]. <br><br> 2. No allegation. <br><br> 3. No allegation. <br><br> 4. Contributing factor to unpaid overtime.[(¶ 21)]. | 1. No allegation. <br><br> 2. No allegation. <br><br> 3. No allegation.[(14:12-14:22)]. <br><br> 4. Contributing factor to unpaid overtime.[(¶ 23)]. |
| **Telephone Conferences** | 1. Unpaid outside of scheduled shift.[(66:5-66:21, 103:9-104:24)]. <br><br> 2. No allegation. <br><br> 3. Contributing factor to unpaid overtime.[(¶ 20)]. | 1. Paid when he arrived early to attend.[(14:18-15:9)]. <br><br> 2. No allegation. <br><br> 3. No allegation. <br><br> 4. Contributing factor to unpaid overtime.[(¶ 21)]. | 1. No allegation. <br><br> 2. No allegation. <br><br> 3. No allegation.[(14:12-14:22)]. <br><br> 4. Contributing factor to unpaid overtime.[(¶ 23)]. |
| **Lunch Breaks** | 1. No allegation.[(99:17-100:20)]. <br><br> 2. Often worked though lunch and usually unpaid.[(¶ 12)]. <br><br> 3. Often worked though lunch, lunch break deducted anyway, and usually unpaid.[(¶ 22)]. | 1. Recorded most of the time he worked during lunch.[(71:15-72:3, 109:19-109:25, 115:20-116:5)]. <br><br> 2. Often worked though lunch and usually unpaid.[(¶ 10)]. <br><br> 3. Often worked though lunch and usually unpaid.[(¶ 12)]. <br><br> 4. Often worked though lunch, timekeeping system required a lunch break, and usually unpaid.[(¶ 23)]. | 1. Often worked though lunch and usually unpaid.[(¶ 10)]. <br><br> 2. Often worked though lunch and usually unpaid.[(¶ 12)]. <br><br> 3. Worked though lunch most days but had the ability to accurately record his lunch breaks.[(15:24-16:9, 73:15-73:22)]. <br><br> 4. Often worked though lunch, timekeeping system required a lunch break or automatically deducted lunch break, and usually unpaid.[(¶¶ 29-30)]. |
| **Manager's Knowledge Re: Off-The-Clock Work** | 1. No allegation that he told managers about off-the-clock work; did not tell managers he was not recording conference call time--does not recall any co-workers complaining about off-the-clock work.[(107:3-107:11)]. <br> 2. Assumed managers knew because they allegedly saw what he was doing.[(¶ 9)]. <br> 3. Told managers he was working off the clock | 1. Did not tell managers or human resources about most of his off-the-clock work.[(78:8-78:14, 116:11-117:6, 130:15-130:22)]. <br> 2. Assumed managers knew because they allegedly saw what he was doing.[(¶ 7)]. <br> 3. Assumed managers knew because they allegedly saw what he was doing.[(¶ 9)]. <br> 4. Told managers he was working off the clock | 1. Assumed managers knew because they allegedly saw what he was doing.[(¶ 7)]. <br> 2. Assumed managers knew because they allegedly saw what he was doing.[(¶ 9)]. <br> 3. Was told overtime would not be approved--NOT that he could not work/record it.[(17:13-19:7)]. <br> 4. Told managers he was working off the clock and his managers |

| | Scutts[95] | Fernandez[96] | Akasala[97] |
|---|---|---|---|
| | and they did nothing about it.[¶ 24). | and he was told only to record scheduled time.[¶¶ 25-26). | unilaterally reduced overtime from his time cards.[¶¶ 22, 26, 35). |

Based on these comparisons alone, Plaintiffs cannot credibly argue that their claims are capable of classwide resolution—*i.e.*, that the answer to one plaintiff's claim will provide the answer to all class members' claims.[98]  Instead, a separate inquiry will be required for each plaintiff to determine the validity of each alleged instance of that plaintiff's off-the-clock work— whether that alleged work occurred before a particular shift, during lunch or after a particular shift—and how each plaintiff reacted to alleged pressure to meet the sales goals.  In addition, as noted above, the Plaintiffs' testimony differs significantly regarding their managers' alleged knowledge of their off-the-clock work.  Thus, because the "record before the court demonstrates that there is no common policy or scheme and instead individualized questions of fact predominate, the action is not an appropriate one for certification." *Blaney v. Mecklenburg Hosp. Auth.*, No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302, at *34 (W.D.N.C. Sept. 16, 2011).[99]

**F.     Plaintiffs Represent A Miniscule Percentage Of The Proposed Class.**

Courts routinely examine the size and scope of a putative class when considering conditional certification under the FLSA.  *See e.g., Vazquez v. Vitamin Shoppe Indus.*, No. 10 Civ. 8820 (LTS)(THK), 2011 U.S. Dist. LEXIS 74376, 10-11 (S.D.N.Y. July 11, 2011); *Guillen v. Marshalls of MA. Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2012).  In *Vazquez*, this District Court

---

[98] *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551  (2011) ("What matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.") (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

[99] *See also Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382, *17-18 (W.D.N.Y. Oct. 17, 2005) (concluding that an analysis of plaintiff's schedule, times actually worked, and whether his timesheet was altered prevents a finding that plaintiff is similarly situated to the putative class).

denied conditional certification of a nationwide class where the plaintiff's allegations focused solely on six individuals all of whom worked at store locations in Brooklyn and Manhattan. *Vazquez*, 2011 U.S. District LEXIS 73367 at *10.  The Court in *Vazquez* not only refused to certify a nationwide class, it also refused to certify a New York State class, finding that the plaintiff's concentration in just a few New York City locations was insufficient to establish a statewide unlawful practice. *Vazquez*, 2011 U.S. District LEXIS 73367 at *13.  In *Guillen*, the District Court found the plaintiff's evidence to be "extremely thin…essentially consist[ing] of affidavits from five ASMs who experienced the allegedly illegal activities at nine of the 820 Marshalls stores nationwide...the nine stores are exclusively in the New York City metropolitan area." *Guillen*, 750 F. Supp. 2d at 18-19.

Various other district court in New York have also refused to credit the allegations of a microscopic fraction of a proposed class. *See Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 173-74 (W.D.N.Y) (denying conditional certification of a class of 100,000 when only evidence was allegations of two plaintiffs who worked at one store, one affidavit from employee at another store, and additional affidavits that were "incomprehensively vague as to the material circumstances" surrounding the alleged policy); *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050 SC and 07-4012 SC, 2011 U.S. Dist. LEXIS 73938, *15 (N.D. Cal. July 8, 2011) (decertifying collective action because the plaintiffs had provided "no reliable means of extrapolating from the testimony of a few exemplar class members to the class as a whole").  Likewise, here, the Court cannot extrapolate a regional or statewide unlawful policy or practice involving hundreds of locations and thousands of putative class members from the testimony of three plaintiffs who

worked at a total of six branches within a one-half square mile area of midtown Manhattan—particularly when their testimony is contradictory and unreliable.[100]

It is also well-established that "[a] showing that others desire to opt in is required before certification and notice will be authorized by the court." *White v. KCPAR, Inc.*, No. 6:05-CV-1317, 2006 U.S. Dist. LEXIS 100966, *6-7 (M.D. Fla. June 2, 2006).[101]   Critically, this requirement "is relevant to deciding whether or not to put a defendant employer to the expense and effort of notice of a conditionally certified class of claimants in a collective action." *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 U.S. Dist. LEXIS 5002, at *34 (S.D. Tex. Jan. 24, 2007).   Here, Plaintiffs failed to meet this necessary burden.   Although Plaintiffs' counsel have been prosecuting these claims for two years—since they filed the *Richardson* and *Switzer* cases in March 2011—only four out of thousands of potential class member have joined this action: the three named plaintiffs who joined the prior lawsuits in May and August of 2011, and one opt-in plaintiff who recently joined the lawsuit on February 6, 2013—two days before Plaintiffs filed their Motion.   Moreover, Fernandez and Scutts both testified at their depositions that they are not aware of any of their co-workers who worked off the clock.[102]   Hence, there is no reasonable basis to believe that other aggrieved individuals exist sufficient to put Wells Fargo to the expense and effort of a multi-state class and collective action lawsuit.[103]

---

[100] The plaintiffs in *Guillen* worked at 1.1% of the 820 nationwide Marshalls locations (*see Guillen*, 750 F. Supp. 2d at 477), while the Plaintiffs here worked at only 0.8% of the approximate 750 Wells Fargo branches in the Northeast Region.   The plaintiff-to-total-business-location ratio in *Guillen* was therefore greater than in this case, bolstering the argument that conditional certification is not appropriate here.

[101] *See also Pfohl v. Farmers Ins. Group*, No. cv 03-3080, 2004 U.S. Dist. LEXIS 6447, at *31 (C.D. Cal. Mar. 1, 2004) (denying conditional certification of class in part because plaintiff has failed to show that any members of the putative class were likely to assert similar claims).

[102] *See* note 30, *supra*.

[103] *See Rodgers v. CVS Pharmacy, Inc.*, No. 8:05cv770T-27MSS, 2006 U.S. Dist. LEXIS 23272, *13-14 (M.D. Fla. Mar. 22, 2006) (plaintiff's affidavit and the affidavits of two other co-workers—the only two to file consents to join during the prior year—were insufficient evidence that there were other employees who desired to opt in to lawsuit, particularly when defendant filed declarations of 31 current employees testifying that they were properly paid);

### G.    Each Putative Class Member Is Subject To Different Defenses.

Another reason courts regularly decline to certify off-the-clock classes is that employers are entitled to raise claimant-specific defenses of a legal and/or factual nature.[104]  In this case, Wells Fargo's potential defenses to any alleged FLSA and NY-law violations will require highly individualized evidence concerning each employee.  Those defenses would include, for example:

- Demonstrating that each employee had knowledge of Wells Fargo's timekeeping policies and policies banning off-the-clock work but violated those policies;

- Responding to each class member's off-the-clock claims, and addressing whether and to what extent each Personal Banker was paid for any such work;

- Arguing that any alleged instances of off-the-clock activity did not constitute compensable work under the FLSA or are barred by the Portal-to-Portal Act, 29 U.S.C. § 254, as preliminary or postliminary activities;

- Arguing that any alleged overtime is de minimis;

- Showing that Wells Fargo managers did not know about the alleged off-the-clock work and that class members failed to take advantage of Wells Fargo's system of reporting time and/or requesting overtime; and

- Demonstrating that each manager or supervisor acted in good faith and that liquidated damages are not appropriate.

These defenses, and others, require anecdotal, particularized proof for each opt-in and provide yet another reason why certification would render a collective trial unmanageable.

### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED

### A.    Class Certification Standard Under Rule 23

Courts in the Second Circuit conduct a "rigorous analysis" when determining whether plaintiffs have met their Rule 23 burdens.  *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d

---

*Badgett v. Tex. Taco Cabana, L.P.*, No. H-05-3624, 2006 U.S. Dist. LEXIS 74530, *10-12 (S.D. Tex. Oct. 12, 2006) (declining to certify class when the three plaintiffs had only offered evidence of one additional employee potentially desiring to opt in, despite "nearly a year's investment in this litigation"); *White*, 2006 U.S. Dist. LEXIS 100966, *8 (plaintiff failed to show that other aggrieved individuals exist other than the two individuals who filed consents to join).

[104] *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 n.7 (5th Cir. 1995) ("The disparate individual defenses asserted by [defendant] heightens the individuality of the claims and complicates the significant management problems.").

24, 37 (2d Cir. 2006); *M.O.C.H.A. Soc., Inc. v. City of Buffalo*, No. 98 Civ. 99, 2008 WL 343011, *1 (W.D.N.Y. Feb. 6, 2008). The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) also emphasized the importance of a "rigorous analysis" of the Rule 23 requirements, rejecting the plaintiffs' attempts to demonstrate commonality where the evidence was "too weak to raise any inference" of a uniform unlawful policy or practice. *Id*. at 2256.

**B.    The Various Documents And One Work-Hours Survey Prepared Before The FS Reclassification Do Not Support Plaintiffs' Off-The-Clock Claims.**

In December 2000, First Union Bank ("FUB," Wachovia's predecessor), reclassified the FS position from exempt to non-exempt,[105] and began paying them a fixed salary plus overtime at half their regular rate of pay under the fluctuating work week ("FWW").[106] Wachovia paid FSs under the FWW method until approximately November 2009 when, following Wells Fargo's purchase of Wachovia, Wells Fargo transferred all FSs to its payroll system and began paying them as hourly employees with overtime at one-and-one-half times their regular rate.[107]

Plaintiffs devote many pages discussing a survey regarding the work habits of exempt FSs and other documents prepared before the FS reclassification. Yet none of the four plaintiffs was working for Wachovia at the time of the reclassification—or even within the six years after

---

[105] Despite Plaintiffs' claims to the contrary, the initial impetus leading to the FS reclassification was the company's concern and desire to ensure that it complied with the FLSA and DOL regulations. *See* FLSA Q&As, Ex. G-1, at WF 010515 ("In order to ensure our continued compliance with the DOL's interpretation of the Fair Labor Standards Act, First Union is taking proactive measures to re-classify the FS position."); *see also* Deposition of Tracy Kidd ("Kidd Dep."), Ex. B-3, at 212:16-19 ("We consciously chose to err on the side of converting more jobs to non-exempt that we thought we needed to in order to comply with the law.").

[106] *See* Declaration of Tracy Kidd ("Kidd Decl."), Ex. H, ¶ 3. The FWW method provides an alternative way to calculate overtime premiums when certain conditions are met. Under the FWW method, since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due for the hours worked in excess of forty each workweek. *See* 29 C.F.R. § 778.114(a) ("Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.").

[107] Declaration of Delvin Bryant ("Bryant Decl."), Ex. F, ¶ 3, Ex. E, ¶12.

15365981v.1

the reclassification.[108]  Because Plaintiffs lack personal knowledge regarding the reclassification, they attempt to draw speculative inferences and unfounded connections between the documents and their alleged individual experiences many years later.  But as demonstrated below, these documents do not support Plaintiffs' claims.

> ### 1.    The "Work Hours Survey" Does Not Support Plaintiffs' Claims.

Before the reclassification, Wachovia conducted a survey of approximately 19 Financial Sales Leaders ("FSLs") to analyze the FSs' work hours and schedules, and thereby determine the number of overtime hours to pay (voluntarily) as back wages.[109]  The FSLs who completed this survey responded that a majority (but not all) exempt FSs were working between 40-50 hours each week to meet or *exceed* the performance expectations.  But this is not surprising—the FS position was exempt at the time and FSs could work as many hours as they wished.

Based on this limited survey, Plaintiffs speculate that all FSs continued to work 5-10 overtime hours after the reclassification.  They then assert the unfounded, conclusory allegation that Wachovia was not willing to pay for those overtime hours.[110]  But these allegations are simply unsupported speculation.  Plaintiffs have <u>no evidence</u> that a majority of FSs continued to work 5-10 overtime hours after the reclassification—or that they continued to do so a decade later.  Again, these documents were prepared six years before Plaintiffs began working for Wachovia.  And even if a majority of FSs continued to work significant amounts of overtime, Plaintiffs have <u>no evidence</u> that Wachovia refused to pay for overtime that was pre-approved or

---

[108] *See* Kidd Decl., Ex. H, ¶ 3.
[109] *See* Ex. 49 to Plaintiffs' Motion at WF 010592 (showing 19 individual FSLs responded to the survey); *see also id.* Ex. 51, at WF 010652 (noting that FUB surveyed 20 FSLs "to determine work habits, overtime hours, vacation").
[110] *See* Plaintiffs' Motion at 4-5 and 15-16.

logged on employee timecards,[111] or that Wachovia systematically required or pressured FSs to work off the clock to meet performance goals and bonus targets.  Rather, the contemporary documents conclusively demonstrate that:

- Wachovia  instructed FSs to record all hours worked, whether pre-approved or not;[112]
- Wachovia was ready to pay overtime for FSs, and provided managers with some examples of activities for which they should expect to pay for overtime;[113] and
- Wachovia instructed managers that they must pay for overtime hours worked whether pre-approved or not, and that they would be disciplined if they allowed or required FSs to work off the clock.[114]

### 2.    The Transition To Overtime For FSs Was Gradual; Wachovia Eliminated And Reduced "Time Robbers."

Plaintiffs selectively quote various out-of-context documents to suggest that the transition to overtime occurred overnight, and put pressure on the FSs to instantly alter their timekeeping and work habits.  But the contemporaneous documents paint a very different picture.  For instance, Gwynne Whitley (FUB V.P. of Human Resources) explained to FSs in late November

---

[111] Plaintiffs argue that even when FSs logged overtime on their timecards, it was "subject to being 'adjusted' by upper management."  *See* Plaintiffs' Motion at 6-7.  In support of this allegation, Plaintiffs cite pages 95 and 102 of the deposition testimony of Constantine Santiano, a Wachovia District Manager in the Houston, Texas area.  But Santiano did not say what Plaintiffs claim he says.  Santiano does not discuss timekeeping practices or overtime in pages 95 and 102 of his deposition.  Instead, he testified about bank opening and closing procedures.  Moreover, Santiano never testified that Wachovia managers were permitted or encouraged to shave time off employee timecards.  In fact, he testified that it was Wachovia policy to pay for all overtime hours worked.  *See* Santiano Dep., Ex. B-2, at 20:15-19; *see also id.* at 52:19-53:3 ("[I]f at any time these appointments had [the FSs] working more than 40 hours a week . . . they would get paid overtime.…").

[112] *See* "Salaried With Overtime Questions & Answers," Ex. G-9, at WF 010087, Questions Nos. 8 and 9 (instructing FSs that "whether authorized or not, all overtime must be accurately recorded" and that "you must still record all hours worked, whether or not approved"); *see also* November 2000 FLSA Video Broadcast Script, Ex. G-17, at WF 010079-010080 (Ben Jenkins, First Union Bank Vice Chairman and Head of the General Bank, explained to the FSs: "Let me make this clear, though.  <u>We need to record all hours worked.  If you work overtime hours and don't record them, you are NOT helping First Union</u>").

[113] *See* "Salaried With Overtime Questions & Answers," Ex. G-9, at WF 010087, Question No. 1 ("In addition, if you work more than 40 hours during any week, you also will receive overtime.); *see also* FSL Training Handout No. 7, Talking Points About Overtime, Ex. M-14, at WF 010119.

[114] *See* FSL Training Handout No. 6, Salaried With Overtime Questions & Answers For Managers, Ex. M-13, at WF 010115, Question No. 23 (instructing managers that "whether authorized or not, <u>all</u> overtime must be accurately <u>recorded</u> and <u>paid</u>" and explaining that "**[y]ou should never allow an employee not to record hours worked.  If you do, you will be subject to disciplinary action, up to and including immediate termination**) (emphasis in original); *see id.* Question No. 24; *see also* FSL Training Handout No. 4, First Union's Core Values, Ex. M-11, at WF 010108.

37

2000 that after the reclassification, the transition would take place over several months and would be a learning experience for both the FSs and their supervisors.[115]  In fact, FUB/Wachovia divided the transition into discrete phases with training goals and topics for each separate phase: (1) getting used to overtime; (2) improving efficiency; and (3) continuous improvement.[116]  In addition, FUB/Wachovia instructed the FSLs to free up time for FSs by rearranging or eliminating various meetings and other duties, and to work with each FS to increase their efficiency—so they could would work <u>fewer</u> hours after the reclassification.[117]  FSs were also coached about how to be more efficient and reduce after-hours work.[118]

Given these various changes, the contemporary documents show that FUB's management believed it was generally possible for the FSs to achieve their performance and bonus targets after the reclassification within a 40-hour workweek.[119]  This is not surprising, since the FSLs noted on the survey (the same survey Plaintiffs cite) that many successful exempt FSs never worked more than 40 hours.[120]  At the same time, FUB also recognized that overtime for the FSs would be necessary, especially for new or under-performing FSs (who required overtime because they were not efficient) or for high-performing FSs (who required overtime to manage their large book of business and needed to "keep production high").[121]

---

[115] *See* November 2000 FLSA Video Broadcast Script, Ex. G-17, at WF 010081.

[116] *See* FSL Training Handout No. 5, Managing Overtime — A Phased Approach, Ex. M-12, WF 010109 (identifying and explaining FUB's three phases of the transition to overtime for FSs.

[117] FSLs were instructed to minimize "after-hour meetings and partner events" and to identify "time robbers" to "free up time (for the FSs) during the work day."  *See* Excerpt of October 2000 FLSA Training for Financial Specialist Leaders, Ex. G-19, at WF 010095.

[118] *See* FSL Training Handouts Nos. 8-10, Ex. M-15 to M-17, WF 010121-23; *see also* Excerpt of October 2000 FLSA Training for Financial Specialist Leaders, Ex. G-19, at WF 010095.

[119] *See* November 2000 FLSA Video Broadcast Script, Ex. G-17, at WF 010079-80; *see also* Agenda and Talking Points to Accompany FLSA Video, Nov. 29, 2000, Ex. M-18, at WF 010075.

[120] For instance, one FSL noted: "[m]y best person has most effective partnering skills and is out in 40 hours." *See* Ex. No. 49 to Plaintiffs' Motion at WF 010596 (response No. 22 to question 14-Production correlation).

[121] *See* FSL Training Handout No. 7, Talking Points About Overtime, Ex. M-14; WF 010119-18, at WF 010119. Ex. G-17, at WF 010079-80.

3.  **The Role Play Exercises And FS Focus Surveys Do Not Support Plaintiffs' Off-The-Clock Claims.**

Plaintiffs also rely on a hypothetical "role play" exercise that anticipated some of the concerns FSs would have after the reclassification.[122]  Plaintiffs selectively quote the responses to these hypotheticals to make it appear as though FUB knew all along that FSs would not be able to achieve their performance goals without working off the clock.  But other responses (which Plaintiffs fail to cite) demonstrate that FUB did not believe this would be the case for a number of different reasons:

- "You still will be able to work some overtime but I really want to encourage you to do several things to help your efficiency."
- "Work with the other FS and CRM to determine times when you can come in later or leave early as offsetting time."
- "I am going to reduce meetings after hours and will help minimize assignments that take you out of the office during the day."
- "I think that if we work at getting more done during the workday and having that time after hours for personal interests, then the goals can still be met and you will feel more balance."[123]

Plaintiffs also cite various responses to a handful of FS and Senior FS focus group surveys that Wachovia conducted in 2003 and 2004—multiple years before Plaintiffs began working for Wachovia.  Yet they claim these responses demonstrate that many FSs had previously complained to Wachovia that they could not meet their "astronomical goals" under "limited overtime budgets."[124]  But here too Plaintiffs simply mischaracterize the evidence.  First, not one of the several hundred responses provided by FSs (including the ones that Plaintiffs cite) mention working off the clock or include any reference to limited overtime budgets.  Second, out of several hundred responses, Plaintiffs refer to a handful of responses by FSs who

---

[122] *See* Plaintiffs' Motion at 4-5 & note 14.

[123] *See* Ex. 45 to Plaintiffs' Motion at WF 010132-010133.

[124] *See* Plaintiffs' Motion at 17-18 & notes 102-105.

complained that their performance requirements were too demanding.  But this is not evidence of any unlawful policy or practice.  Those type of responses are commonplace in any workplace survey.  Third, two of the four responses upon which Plaintiffs rely are not relevant because they refer to the incentive or bonus targets, which FSs were not required to meet, but were instead voluntary bonus thresholds.

### 4. There Is No Direct Correlation Between Performance And Hours Worked.

Plaintiffs' theory also fails because it is based on a false premise.  According to Plaintiffs, there is a direct correlation between the number of hours a FS worked and their performance.  Thus, their theory goes, all FSs had to work more hours and work overtime to meet their performance goals.[125]  Obviously, this generalized statement could be made with respect to just about any job—the harder/more someone works, the more likely s/he is to meet certain performance goals or expectations.  As a factual matter, however, this was not the case.

For instance, even though the FSLs noted that FSs were working overtime prior to the reclassification, some of the FSLs noted on the FSs work hours survey that there was <u>no correlation</u> between hours worked and "production."  For instance, one FSL noted: "[m]y best person has most effective partnering skills and is out in 40 hours."[126]  Tracy Kidd, the FUB Compensation Director at the time, echoed this observation during her deposition and testified she knew that many of the "top performance did the job in 40 hours."[127]  Moreover, some FSLs noted that more experienced FSs work fewer hours because they know "more shortcuts" and are

---

[125] *See id.* 17.

[126] *See* Ex. 49 to Plaintiffs' Motion at WF 010596 (response No. 22 to question 14-Production correlation).

[127] Kidd Dep., Ex. B-3, at 72:3-12; *see also id.* at 73:3-7.

"more efficient."[128]  This makes sense, as the FSLs noted in the survey, because there are various other factors that "affect how many hours it takes an FS to perform his/her job," including:

- Lobby traffic, service issues, strength of the CRM/supporting staff;
- Market they work in, their organization skills, calling for appointments, technical skills;
- People with family are more efficient/sales focused; and
- Level of pdt knowledge, system proficiency.[129]

The evidence also shows that FSs earned significant amounts of incentive pay (i.e., bonuses).  This is, of course, because incentive pay was not based on the number of hours that FSs worked, but was instead based on sales and other factors.  For example, in 2000, the incentive plan was based on the value (not number)[130] of the products sold; the FSs' customer service scores;[131] whether a particular sale was made collectively by several bank employees;[132] and whether the particular bank branch as a whole attained its sales and customer-service goals.[133]  As the years passed, the incentive compensation plans became more complex, involving different incentives and incentive thresholds between experienced FSs and FSs that were newly-hired or considered "rookies."[134]  And despite Plaintiffs' complaints about

---

[128] *See* Survey For Scheduling Practices And Survey Results, Ex. G-8, at WF 010595 (response No. 17 to survey question No. 12); *see also id.* (response No. 29 to survey question No. 12—"more experience = more efficient and productive"); *id.* (response No. 16 to survey question No. 12—"Use of resources and quality of training have more effect than length of service").

[129] *See* Ex. 49 to Plaintiffs' Motion at WF 010596 (various responses to survey question No. 15).

[130] *See* Kidd Dep., Ex. B-3, 85:4-7 ("Q: The sales made, would that have been based on the volume of sales?  A:  It was more based on the value of the products.").

[131] Incentive Compensation Plan Applicable in 2000, Ex. G-12, at WF 010207 (plan based on attainment of objectives in two categories: (1) "Revenue Credits"; and (2) "Quality Customer Service"); *see also id.* (explaining that revenue credits are based on "revenue thresholds," not number of products sold).

[132] *Id.* at WF 010207 (demonstrating incentive compensation calculations based on "the sharing of revenue between a Financial in First Union Direct Sales and all other employees referring").

[133] *Id.* at WF 010208 ("FSs are eligible to earn incentive on investment sales when monthly bank thresholds are met."); *see also id.* at WF 010214;  Incentive Compensation Plan Applicable in 2008, Ex. G-10, at WF 003554 & 003562 (identifying different incentives and thresholds for those two categories of FSs).

[134] *See, e.g.*, Incentive Compensation Plan Applicable in 2008, Ex. G-11, at WF 003554 & 003562 (identifying different incentives and thresholds for those two categories of FSs).

15365981v.1

impossible performance and bonus targets, a majority of FSs earned incentive compensation between 2004 and 2009.[135]

## C.   Wachovia's Use Of The FWW Overtime Method Was Legally Sound And Not An Unlawful Common Policy.

Plaintiffs claim that Wachovia's use of the FWW method was invalid for several reasons.[136]  They allege that their work hours did not fluctuate from week to week.  They also allege that they lacked a clear mutual understanding that their fixed salaries would cover all hours worked in each workweek.  The Plaintiffs also claim that Wachovia's payment of non-discretionary bonuses in addition to their base salary was unlawful under the FWW method.  But as the following analysis demonstrates, there is no evidence of any class-wide violations of the FWW method.[137]

### 1.   The Putative Class Members' Hours Fluctuated From Week To Week.

Plaintiffs claim their hours did not fluctuate because "FSs were full-time employees scheduled to work 40 hours a week" and because they were expected to try to meet their performance goals "within a 40 hour week."[138]  But these allegations have nothing to do with the FSs' actual work hours.  They simply confuse the difference between the Plaintiffs' typical work schedules (which were used for scheduling and staffing purposes) and their daily time entries and actual hours worked (used for payroll purposes).  Because they lack class-wide evidence on this

---

[135] *See* Summary of FS Cash Compensation History, Ex. J-6, at WF 010686.

[136] *See generally*, Plaintiffs' Motion at 29-32.

[137] Plaintiffs also claim Wachovia misapplied the FWW method because it did not pay them half-time overtime for their alleged off-the-clock work.  *See* Plaintiffs' Motion at 32.  But this is simply a restatement of their off-the-clock claims, not an independent violation of the FWW method.

[138] Plaintiffs' Motion at 29.

issue, Plaintiffs resort to mischaracterizing the testimony of Nino Santiano and selectively quoting out-of-context statements in various the FS reclassification documents.[139]

Santiano never testified that FSs were always limited to a 40-hour workweek.  Instead, because they were salaried employees, he testified the FSs were expected to work "at least 40 hours every week."[140]  And he also explained in the same discussion that they could work overtime and that "if they're working more than 40 hours a week, they were getting paid overtime."[141]  Santiano did not testify (and was never asked) about the actual number of hours that FSs worked which, as demonstrated below, did typically fluctuate above 40 hours per week.

The Plaintiffs' reliance on various out-of-context quotes from old training documents is also misplaced.  In those documents, from before 2001, FUB explained the reclassification from exempt to non-exempt, the reason for the reclassification (*i.e.*, to comply with recent DOL interpretations),[142] and some of the practical consequences of the reclassification, including the fact that the FSs would be responsible for tracking and logging their actual hours worked so the

---

[139] Plaintiffs also rely on the deposition testimony of Tracy Kidd who testified that part-time FSs—those who generally worked less than 35 hours per week—were not classified as salaried with overtime employees, but were instead paid on an hourly basis. *See* Plaintiffs' Motion at 29.  But this has nothing to do with the classification of full-time FSs.  Moreover, the part-time classification has changed over the years.  When the FSs were first reclassified, part-time FSs were those who were regularly scheduled to work less than 20 hours per week, not 35 hours per week. *See* Salaried with Overtime Questions & Answers, Ex. G-9, at WF 010088.

[140] Santiano Dep., Ex. B-2, at 23:22-23. ("Q: And that was the expectation, that financial specialists would work at least 40 hours every week?  A: That was the expectation.").

[141] *Id*. at 23:2-3.

[142] *See* Ex. 42 to Plaintiffs' Motion at WF 010140 ("First Union wants to be proactive in complying with the DOL's recently emphasized view of its job classifications and has therefore changed the FM's status to be 'salaried with overtime'").

company pay them overtime. [143]  In those documents, FUB further explained that because of the reclassification, they should try to meet their goals within a 40-hour workweek if possible.[144]

But FUB also acknowledged in those same documents (and other contemporaneous documents) that the FSs' work hours varied and that Wachovia would pay overtime when necessary.  On one document, FUB explained that it choose to classify the FSs as "salaried non-exempt" because it "[a]cknowledges that the FS does not always work the same exact schedule to meet customer requests and needs salaried workweek (with no hours docked)."[145]  On another document (even cited by Plaintiffs), FUB identified various non-exhaustive examples when FSs could work overtime, including customer appointments, community relations events, "additional time for inexperienced or poor performing FSs to gain skill and efficiency," and "additional time for strong performers to reach personal variable pay goals and keep producing high."[146]

Plaintiffs' own testimony confirms that their work hours varied from week to week.[147]  The declarations provided by many putative class members from New York and the Northeast Region also confirm that their actual hours worked also varied—both above and below 40 hours

---

[143] *See* Plaintiffs' Motion at notes 186-189, Exs. 42, 47, and 48.  *See also* Agenda and Talking Points to Accompany FLSA Video, Nov. 29, 2000, Ex. M-18, at WF 010075 ("Let me reiterate that I must approve any overtime hours before you work them.  Our region has to manage to an overtime target, and the expectation is that you <u>try to meet your goals</u> and customer needs within 40 hours a week when possible.").

[144] *See* Plaintiffs' Motion at notes 186-189, Exs. 42, 47, and 48.  *See also* Agenda and Talking Points to Accompany FLSA Video, Nov. 29, 2000, Ex. M-18, at WF 010075.

[145] *See* Plaintiffs' Motion, Docket No. 34, Ex. 47, at WF 010462; *see* also Except of October 2000 FLSA Training for Financial Specialist Leaders, Ex. G-19, at WF 01009.

[146] *See* Ex. 48 to Plaintiffs' Motion at WF 010486.

[147] In their declarations, for example, Scutts and Fernandez both state they were "typically scheduled for 40 hours per week" but they "almost always worked substantially more than what was on [their] schedule in a given workweek."  Fernandez Decl. ¶ 21, Scutts Decl. ¶ 20, Exs. 2 and 3, respectively, to Plaintiffs' Motion. Jim Akasala also confirmed in his declaration that FSs were typically not limited to a 40-hour workweek: "I was a full-time employee scheduled to work 40 hours per week, but worked substantially more than forty hours per week like the other Financial Specialists…."  Jim Akasala Decl. ¶ 10, Ex. 1 to Plaintiffs' Motion.

15365981v.1

each week.[148]   Neither the FLSA nor the regulations require the employee's hours to fluctuate

above and below forty hours per week.   It is sufficient, as demonstrated above, that Plaintiffs'

and the putative class members' hours fluctuated above 40 hours per week.[149]

### 2.   The Putative Class Members Had A Clear Understanding Regarding The FWW Method.

Courts have routinely held that company documents such as pay stubs, employee

manuals, and/or signed acknowledgments explaining the FWW method are sufficient to establish

a clear and mutual understanding.[150]   Here, there is no class-wide evidence that the putative class

members lacked a clear understanding on a nation-wide basis.   Rather, the evidence on record

shows that the putative class members (and also some of the Plaintiffs) understood and

acknowledged that their salary was meant to compensate them for their straight time for all hours

worked:[151]

- After the reclassification, Wachovia provided training to FSs explaining that they would be classified as "salaried with overtime" and describing the FWW method;[152]
- Wachovia provided offer of employment letters to Financial Specialists that explained they would be classified as "salaried with overtime" and described the FWW method;[153]
- Declarations provided by various putative class members show the Financial Specialists were told about the FWW method and had a clear mutual understanding that their salaries covered all hours worked;[154]

---

[148] *See generally* Exs. O-1 and Q-2, Comparison Among Declarants Regarding Number Of Hours Scheduled And Worked.

[149] *See, e.g., Condo v. Sysco Corp.*, 1 F.3d 599, 602-03 (7th Cir. 1993), cert. denied, 510 U.S. 1110 (1994) (upholding application of the fluctuating workweek where only the amount of overtime varied).

[150] *See e.g., Daniels v. Michiana Metronet, Inc.*, No. 1:09-cv-121, 2010 U.S. Dist. LEXIS 43686, *21-22 (N.D. Ind. May 3, 2010) (employer showed clear mutual understanding of FWW method because plaintiff had signed acknowledgment explaining FWW compensation).

[151] In their near uniform declarations, Plaintiffs allege they did not understand how their pay was calculated under the FWW method.  But the law requires no such understanding. *See Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 40 (1st Cir. 1999) (finding that the FLSA does not require that employees understand how their overtime is calculated for purposes of establishing a clear mutual under the FWW method).

[152] *See, e.g.,* Salaried With Overtime Questions & Answers, Ex. G-9, at WF 010086-87.

[153] *See* Sample Offer Of Employment Letters Of Putative Class Members In New York, Exs. D-1 to D-6 (including Fernandez and Scutts).

45

- Wachovia's corporate policies—available to all Financial Specialists on the Company's internal website—explained how the FWW method worked;[155]
- The Plaintiffs and the putative class members had access to their semi-monthly pay vouchers which showed a consistent salary regardless of their actual hours worked, plus overtime compensation at half-time.[156]

Plaintiffs cite *Dingwall v. Friedman Fisher Assocs.*, 3 F. Supp. 2d 215 (N.D.N.Y. 1998) for the proposition that a company manual indicating that "personnel are normally expected to work a 40 hour week with the exception of pre-established holiday" is sufficient to "negate a clear mutual understanding."[157]   But *Dingwall* is not at all analogous to this case.   *Dingwall* was an FLSA misclassification case, not an off-the-clock case.   Moreover, it involved one plaintiff, not allegations related to a class of putative plaintiffs.   After the court decided that the lone plaintiff was misclassified, the employer argued for the application of the fluctuating workweek method after-the-fact—in relation to the Court's calculation of damages (arguing for a .5 multiplier instead of a 1.5 multiplier).   The Court rejected this argument because "[t]here [was] no evidence in the record that plaintiff clearly understood that his salary was intended to compensate him for any hours worked." *Id*. at 221.   This was not surprising since, unlike this case, the employer did not pay the plaintiff under the fluctuating workweek method.   Moreover, as discussed above in this section, there are various kinds of documentary evidence, including

---

[154] *See generally* Exs. O-3 and Q-3, Statements By Declarants Regarding Salaried With Overtime Compensation. *See, e.g.*, Schuler Decl., Ex. N-2, ¶ 14 ("I remember when Wachovia reclassified the Financial Specialist position from exempt to non-exempt salaried with overtime. During this transition, the Wachovia Sales Manager led a meeting about reclassification with me and other Financial Specialists. She explained the new classification and explained how I was going to be paid. When I worked as a Financial Specialist, I understood that I was being paid a fixed salary for all my hours worked, plus overtime at half-time.").

[155] *See* Excerpts from My Time For Managers, Ex. M-19, at WF 003472 ("Employees paid as 'salaried with overtime' receive a minimum weekly salary for each workweek, which is intended to compensate them for all hours worked regardless of the number of hours they actually worked or quality of work performed in a workweek.").

[156] Scutts received half-time overtime compensation on nearly 20 occasions. *See, e.g.*, Excerpts from Scutts' payroll records, Ex. M-32, at Scutts 000111-000145; *see also* Excerpts from Fernandez's payroll records, Ex. M-22, at Fernandez 000037-000057.

[157] *See* Plaintiffs' Motion at 31.

declarations from other FSs, training documents, employee manuals, and offer of employment letters, demonstrating that the putative class members did have a clear mutual understanding.

### D.  Plaintiffs Cannot Re-litigate The Legality Of The Bonus Payments Because Judge Atlas Previously Decided This Exact Legal Question Against Them.

Plaintiffs claim they were not paid a "fixed" salary (and that Wachovia's use of the FWW method was therefore invalid) because the FSs sometimes received nondiscretionary bonus payments (monthly, quarterly, or on an annual basis) in addition to their base salary.[158]  They made this same argument in the *Switzer* case and lost on cross-motions for summary judgment. That ruling has preclusive effect and bars Plaintiffs' attempt to relitigate this question of law. Wells Fargo can easily satisfy the elements of issue preclusion here.[159]

First, the parties had a full and fair opportunity to litigate the identical issue of law in the prior *Switzer* action.[160]  After months of discovery, the parties filed cross-motions for summary judgment on this question of law, including response and reply briefs.[161]  Second, Judge Atlas ruled on the merits on August 24, 2012 that Wachovia's payment of bonuses under the FWW

---

[158] *See* Plaintiffs' Motion at 30-31.

[159] Collateral estoppel or issue preclusion bars relitigation of an issue when: "(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action."  *See In re Hyman*, 502 F.3d 61, 65 (2d Cir. 2007).

[160] In that case, a group of former FSs (including the three named Plaintiffs here) moved for conditional certification of a nationwide collective action of all FSs who were paid under the FWW method.  As in this case, the plaintiffs in *Switzer* argued that Wachovia's payment of non-discretionary bonuses to the FSs was unlawful under the FWW because it meant that they were not paid a "fixed" salary.  *See* August 24, 2012 Memorandum and Order ("*Switzer* Order"), Ex. R-10, at 2.

[161] *See Switzer* Order, Ex. R-10, at 1 (identifying four separate briefs filed by the parties relating to this issue). Wells Fargo respectfully asks the Court to take judicial notice of the parties' briefing on cross-motions for summary judgment on this issue and Judge Atlas' ruling in the prior *Switzer* case.  *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (federal court may take judicial notice of filings in other courts, regulatory filings and other publicly available documents); *Corley v. Jahr*, No. 11 Civ. 9044 (RJS)(KNF), 2013 U.S. Dist. LEXIS 10012, *14016 (S.D.N.Y. Jan. 23, 2013) (taking judicial notice of various pleadings and filings in related state-court litigation to determine collateral estoppel defense).

47

method was lawful as a matter of law.[162]  This ruling has preclusive effect here—particularly on the named Plaintiffs' individual claims.  Their attempt to relitigate this question of law is contrary to public policy favoring finality and should not be permitted.[163]

**E.    Plaintiffs' Off-The-Clock Claims Fail To Meet The Rigorous Rule 23 Standard**

**1.    Plaintiffs Cannot Establish Commonality And Typicality Under Rule 23(a)**

Rule 23's requires a more exacting and rigorous standard for class certification than Section 216(b) of the FLSA.  Because Plaintiffs cannot meet 216(b)'s standard, they cannot meet the higher standard imposed by Rule 23.  In addition, the U.S. Supreme Court's decision in *Dukes* demonstrates why Plaintiffs' claims fail to meet the commonality and typicality requirements under Rule 23.[164]  The Court in *Dukes* held that commonality is not present unless a "common contention" is "capable of classwide resolution,"  meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2551-52.

The *Dukes* plaintiffs' claims were not capable of classwide resolution because local supervisors exercised discretion in employment matters, such that "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's," and thus class members' claims would not "depend on the answers to common questions."  *Id.* at 2554.  The Court specifically rejected the plaintiffs' attempt to extrapolate a common issue from

---

[162] Judge Atlas found: (1) that Wachovia's bonuses were not based on the number of hours the employee worked; and (2) that Wachovia's payment of such bonuses under the FWW method was lawful as a matter of law.  *See Switzer* Order, Ex. R-10, at 5-12.

[163] To the extent the Court determines that Judge Atlas' ruling does not have preclusive effect in this case, Wells Fargo requests that the Court allow the parties to brief the issue regarding the legality of the bonus payments under the FWW method prior to ruling on class certification.

[164] As a practical matter, typicality and commonality "tend to merge in the Second Circuit's class certification inquiry."  *Iglesias-Mendoza v. La Belle Farm Inc.*, 239 F.R.D. 363, 370 (S.D.N.Y. 2007).  The two elements are related  because "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 158 (U.S. 1982).

anecdotal evidence of an insignificant sample of plaintiffs, finding that such evidence fell "well short" of a showing of commonality.  *Id.* at 2555.

The same reasoning applies here.  As demonstrated above, the totality of the evidence shows that there is no common contention "capable of classwide resolution."  Rather, the resolution of each Plaintiff's off-the-clock claim will depend on numerous, highly-individualized inquiries specific to each individual class member, including how each plaintiff and/or each manager reacted to alleged pressure to meet performance goals.[165]  The Plaintiffs' claims regarding alleged violations of the FWW method also cannot be resolved with common proof but will instead hinge on numerous individualized determinations.[166]

### 2.    Plaintiffs Cannot Satisfy The Predominance Requirement

The Rule 23(b)(3) predominance requirement is more demanding than the commonality requirement under Rule 23(a).  *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 401 (S.D.N.Y. 2008); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  To satisfy Rule 23(b)(3), Plaintiffs must show two things:  (1) that questions of law or fact common to class members predominate over questions affecting only individual class members; and (2) that a

---

[165] Plaintiffs heavily rely on *Aponte v. Comprehensive Health Management*, No. 10 Civ. 4825 (PKC), 2011 U.S. Dist. LEXIS 60882 (S.D.N.Y. June 2, 2011) for the proposition that there are common questions here appropriate for class certification.  *See* Plaintiffs' Motion at 46.  *Aponte* was a misclassification case—not an off-the-clock case. This Court concluded there were common questions of fact and law—and therefore class certification was appropriate—because all of the plaintiffs performed the same  duties and were classified as non-exempt.  *Id.* at *28. Here, there are no such common questions.  And even if there were, the Court would still be required to conduct individual inquiries into any alleged off-the-clock or FWW violations. *See* note 50, *supra* (discussing fundamental differences between off-the-clock and misclassification cases in the context of conditional and class certification).

[166] For example, regarding Plaintiffs' allegation that they did not have a clear understanding of Wachovia's FWW policy, the jury will have to determine whether each employee ever read Wachovia's handbook or their own offer of employment letter, each of which explains the pay practice; whether the employee ever discussed the pay practice with his or her manager or human resources; whether the employee ever examined his or her pay stub or made any inquiries about it to a manager or human resources; as well as any other evidence possibly explaining how any particular employee failed to clearly understand the policy.  Plaintiffs' claims that some FSs did not work a fluctuating workweek would also require highly individualized inquiries.  If the class is certified, the fact-finder would have to review timekeeping and payroll records on a case-by-case basis to determine whether the hours each FS worked fluctuated from week to week.

class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  FED. R. CIV. P. 23(b)(3).

In this case, Plaintiffs' off-the-clock and FWW claims would create a morass of individual legal and factual issues, as Judge Atlas previously found.[167]  Courts routinely reject attempts to certify off-the-clock claims under Rule 23(b)(3), precisely because they raise the same kinds of individual issues Plaintiffs' claims present here. *See*, *e.g.*, *In re Bally Total Fitness of Greater New York, Inc.*, 411 B.R. 142, 146-47 (S.D.N.Y. 2009) (even though plaintiffs alleged "uniform policies and practices," they still could not establish predominance under Rule 23(b)(3) because individual issues would lead to "a series of highly disputed mini-trials").[168]

Plaintiffs also fail to establish that a class action is superior to individualized litigation. Although the "superiority" requirement requires analysis of the four factors listed in Rule 23(b)(3)(A)-(D), Plaintiffs do not provide any explanation concerning why those factors justify certification here.  With regard to the first factor—*i.e.*, the class members' interests in individually controlling separate actions[169]—Plaintiffs offer no evidence or analysis.  Instead, it is likely that putative class members have an interest in filing and controlling their own lawsuits because New York law entitles would-be plaintiffs to recover their attorneys' fees, and thus individual actions are economically and logistically viable here.

---

[167] *See* pages 28-31, *supra*.

[168] *See also England v. Advance Stores Co.*, 263 F.R.D. 423, 457 (W.D. Ky. 2009) (plaintiff could not establish predominance under Rule 23(b)(3) because off-the-clock claims threatened "a series of mini-trials"); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002) (plaintiffs could not establish predominance under Rule 23(b)(3) because too many individualized issues existed).

[169] *See* FED. R. CIV. P. 23(b)(3)(A).

**F.**     **Plaintiffs' ERISA Claims Are Not Suitable For Class Certification Under Rule 23**

**1.**     **The Named Plaintiffs Are Not Adequate Representatives Because They Failed To Exhaust Their Plan Remedies**

Plaintiffs characterize their ERISA claims as statutory and their relief as injunctive, but they seek only additional Plan benefits.[170]   A plaintiff bringing an ERISA claim for additional plan benefits is required to exhaust Plan claim and appeal remedies before pursuing claims in court.  *See Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006) ("ERISA requires both that employee benefit plans have reasonable claims procedures in place, and that plan participants avail themselves of these procedures before turning to litigation.").  Plaintiffs seek to avoid this rule simply by characterizing their claim for additional benefits as one for injunctive relief.  This court should not allow that effort to succeed; if it does, the carefully crafted statutory requirement for claim and appeal procedures, *see* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 *et seq.*, would be nullified, and this and other district courts would experience a substantial increase in ERISA litigation that otherwise would be resolved through those private dispute resolution procedures.  The three named Plaintiffs have not pled that they have exhausted their administrative remedies.  In fact, this is undisputed.

It is well settled in the Second Circuit that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).  This stems from the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id*.  And courts regularly deny class certification where the named plaintiffs failed to exhaust plan remedies.  *See Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355-57 (S.D.N.Y.

---

[170] *See* Wells Fargo's Motion to Dismiss Plaintiffs' ERISA Claims, Docket No. 30, at 4-7.

2004) (denying class certification because adequacy and typicality not met, since named plaintiffs of proposed ERISA class action failed to exhaust administrative remedies).[171] Plaintiffs have not exhausted their plan remedies and are therefore not adequate class representatives. Their request for certification of the proposed ERISA class should be denied.

### 2. Plaintiffs' ERISA Claims Should Not Be Certified For The Same Reasons Why Their Overtime Claims Should Not Be Certified.

Management of an ERISA class in this case presents the Court with a great burden, which renders class certification inappropriate. As one district court noted in a case involving misclassified independent contractors and similar tag-along ERISA claims:

> [A]lthough Plaintiffs allege Defendants uniformly characterized rotators as independent contractors to exclude them from receiving various benefits, Plaintiffs have not shown that liability turns predominately on the common issue of whether Defendants controlled the manner and means of the rotators' work. Rather, Defendants have shown that liability would turn on individual issues, including the terms of the individual plans and whether each proposed class member meets the eligibility criteria for each of the plans and would have opted for benefits. Determining which of the over-forty-thousand potential class members in many states meet the eligibility criteria for the various employee benefits and benefit plans asserted would present an overwhelming number of individual issues. A class action here is not the superior method by which to adjudicate such a dispute and ultimately could require a multitude of mini-trials pertaining to the individual circumstances of rotators.[172]

The same result is warranted in this case. For these additional reasons, class certification of the Plaintiffs' ERISA claims is not appropriate.

---

[171] *See also Amador v. Superintendents of the Dep't of Corr. Servs.*, No. 03 Civ. 0650 (KTD) (GWG), 2005 U.S. Dist. LEXIS 20249, *30-31 (S.D.N.Y 2005) (denying class certification in civil rights case because the named plaintiffs failed to exhaust administrative remedies).

[172] *See Oplchenski v. Parfum Givenchy, Inc.*, 254 F.R.D. 489, 500 (N.D. Ill. 2008) (denying plaintiffs' request for Rule 23 certification of breach of ERISA fiduciary duties based on alleged misclassification of employees as independent contractors).

15365981v.1

## CONCLUSION

For the reasons set forth above, Wells Fargo respectfully requests that the Court deny Plaintiffs' Motion.  If this Court grants Plaintiffs' Motion, Wells Fargo respectfully requests a meaningful opportunity to confer with Plaintiffs regarding a proposed notice to send to the putative class members.  In the event the parties are unable to reach an agreement, Wells Fargo respectfully requests an opportunity to brief any issues related to the scope or terms of any proposed notice.

Dated: Houston, Texas
      March 11, 2013

SEYFARTH SHAW LLP


By: /s/ Esteban Shardonofsky
    Timothy M. Watson (pro hac vice)
    twatson@seyfarth.com
    Esteban Shardonofsky (pro hac vice)
    sshardonofsky@seyfarth.com
    700 Louisiana Street, Suite 3700
    Houston, Texas  77002-2797
    Telephone:  (713) 225-2300
    Facsimile:  (713) 225-2340

    Robert S. Whitman
    rwhitman@seyfarth.com
    Adam J. Smiley
    asmiley@seyfarth.com
    620 Eighth Avenue
    New York, New York  10018
    Phone:  (212) 218-5500
    Fax:  (917) 344-1258

    ATTORNEYS FOR DEFENDANTS

15365981v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2013, I caused Defendants' Opposition To Plaintiffs' Motion For Rule 23 Class Certification And FLSA Conditional Certification to be filed using the United States District Court for the Southern District of New York's CM/ECF electronic filing system, which sent notification of such filing to all parties registered to receive notice via that service, including Plaintiffs' counsel of record listed below.

Rhonda H. Wills
Wills Law Firm
1776 Yorktown, Suite 600
Houston, Texas 77056

John M. Padilla
Padilla, Rodriguez & De La Garza, L.L.P.
1776 Yorktown, Suite 110
Houston, Texas 77056

Michael Raymond DiChiara
Krakower DiChiara LLC
One Depot Square
77 Market Street, Suite 2
Park Ridge, NJ 07656

/s/ Esteban Shardonofsky
Esteban Shardonofsky

54